HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL CONTI,

        Plaintiff,

    v.

CORPORATE SERVICES GROUP, INC.,
et al.,

        Defendants.

CASE NO. C12-245RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on a motion for summary judgment from Defendants and a motion for partial summary judgment from Plaintiff Michael Conti. Although Plaintiff requested oral argument, the court finds oral argument unnecessary. For the reasons stated herein, the court DENIES both motions, except that it grants judgment as a matter of law on a narrow issue regarding Mr. Conti's duty to mitigate damages.  Dkt. ## 49, 54.  This order concludes with instructions for the parties to either elect to begin trial on June 10, or to elect to begin trial on or after August 19.

## II.  BACKGROUND

Mr. Conti, who was born in Colombia in 1945, is a lawful permanent resident of the United States who began living in this country in 1963.  It is undisputed that he speaks English with an accent; how well he communicates in English is one of the primary disputes underlying this case.

ORDER – 1

In December 2009, Mr. Conti responded to a job announcement from Defendant Corporate Services Group, Inc. ("CSG"). CSG provides telephone call center services. At all times relevant to this case, CSG's biggest customer was Microsoft Corporation, which provided CSG with 90% of its business. Microsoft had directed CSG to begin a pilot project making calls to Latin America as part of an attempt to expand a Microsoft educational program (the "Latin-American project"). CSG sought out a native speaker of Latin-American Spanish as well as a native speaker of Brazilian Portuguese. Mr. Conti was among the candidates who applied for the position requiring Spanish skills.

At the time, Stacey Gardner was the program manager of CSG's "MSL" team,[1] which consisted of seven or eight people making calls. The MSL team handled the Latin American project, but it also handled other programs for Microsoft. Among those was the SATV program, a program in which CSG employees spoke with Microsoft customers regarding the use of training vouchers. Everyone on the MSL team (indeed, it would appear every CSG employee tasked primarily with making phone calls) was decades younger than Mr. Conti.

Ms. Gardner interviewed Mr. Conti and two other Spanish-speaking applicants out of a pre-screened group of at least five applicants. Both of the other applicants were much younger than Mr. Conti. She nonetheless hired Mr. Conti. She offered him an hourly wage of $18, and agreed to his request that he be paid $20 per hour. Ms. Gardner was the only person with a substantive role in the decision to hire Mr. Conti. Indeed, she was the only CSG employee who spoke with Mr. Conti. The Microsoft employee who acted as the liaison with CSG's MSL team participated in Mr. Conti's interview at Ms. Gardner's request, because he spoke Spanish (unlike her) and believed he could assess Mr. Conti's Spanish-language skills. Other than confirming that Mr. Conti spoke Spanish fluently, the liaison had no role in hiring him. The record demonstrates beyond

---

[1] The parties often use acronyms and jargon to describe work at CSG. Sometimes they explain the terms, sometimes not. "MSL," for example, apparently refers to "Microsoft Learning." The court will generally not attempt to decipher the acronyms and jargon it repeats in this order.

ORDER – 2

dispute that Microsoft had no role in any of CSG's personnel decisions, and took no position as to who should be hired or fired or as to CSG salaries.

Although Ms. Gardner and Mr. Conti discussed the Latin American project at his interview, it is not clear whether Mr. Conti expected or should have expected to work solely on that project. Ms. Gardner did not tell him that his employment was tied to the Latin-American project. It is also not clear whether Mr. Conti knew that his $20 hourly wage was a premium over his MSL team coworkers' wages. CSG contends that it paid the premium in light of Mr. Conti's Spanish skills and because the Latin-American project would require shifts at odd hours to correspond to other time zones. It is again unclear if anyone told Mr. Conti that these factors motivated Ms. Gardner's initial pay decision. What is clear is that CSG hired him as a "Business Partner Expert I," a full-time position with benefits. His December 31, 2009 offer letter made no mention of the Latin-American project.

Mr. Conti began work in January 2010. There is no dispute that for at least a portion of his first few months at CSG, he performed work for the MSL team that had nothing to do with the Latin-American project. In particular, he made phone calls in English to support the SATV program. The parties dispute how much SATV work he performed. Mr. Conti declares that he made SATV calls exclusively until the end of March 2010. CSG representatives will only admit that he made some SATV calls in English while CSG waited for the Latin-American project to ramp up. After March 2010, Mr. Conti made calls for the Latin-American project.

There is no dispute that Mr. Conti performed well at CSG. He received internal awards; his work pleased Ms. Gardner; he had no disciplinary issues whatsoever; there is no evidence that any supervisor, coworker, or customer ever complained about him. A jury could conclude that he was a model employee. No jury could conclude that CSG was dissatisfied with his work.

ORDER – 3

In June 2010, CSG learned that Microsoft would discontinue the Latin-American project, effective at the end of the month.  That decision was one of many accompanying the June 30 end of Microsoft's fiscal year.  CSG knew from past experience that the end of the fiscal year typically meant substantial changes in the work CSG performed for Microsoft.  In past years, that had meant a substantial number of layoffs.  In 2010, CSG CEO Jay Leon directed his subordinates to attempt to accommodate the end-of-fiscal-year changes without laying off employees.

Someone (it is not clear who) instructed Ms. Gardner to give her feedback about the employees on the MSL team.  A substantial portion of the MSL team's work would continue in the new fiscal year, although it would perhaps require fewer employees.  By that time, Ms. Gardner was no longer a CSG employee, she was an independent contractor.  She nonetheless continued as the MSL team project manager.  When she became an independent contractor in May 2010, Analyn Bonifacio became Mr. Conti's supervisor.  Unlike Ms. Gardner, Ms. Bonifacio did not work exclusively with the MSL team.  Ms. Gardner retained primary responsibility for supervising the MSL team, including Mr. Conti, even while she was an independent contractor.

Ms. Gardner compiled a ranked list of the employees on the MSL team, based on her understanding of the team's likely work in the upcoming fiscal year.  She did not write the list down.  It is not clear whether the list consisted only of the MSL team members who worked on the Latin-American project or all MSL team members.  It is also not clear if Ms. Gardner knew that lower-ranked employees would face adverse consequences.  What is clear is that Ms. Gardner ranked Mr. Conti lower than at least two other MSL team members.  One was Tiffany Baustert, who is Mr. Conti's daughter.  Ms. Baustert had begun working as an independent contractor on the Latin-American project in May 2010, making $20 per hour.  Mr. Conti trained her.  Like her father, she spoke Spanish.  Unlike her father, she spoke unaccented English.  Another employee whom Ms. Gardner ranked higher was Alessandra Saavedra, a Portuguese-speaker whom Ms.

ORDER – 4

Gardner had hired at the same time she hired Mr. Conti.  Ms. Saavedra made $18 per hour.  No party reveals whether Ms. Saavedra spoke English with an accent, and no one reveals her national origin.  CSG refers to her as a "native Portuguese speaker," Gardner Decl. (Dkt. # 52) ¶ 9, which the court takes to mean she was born outside the United States.

Ms. Gardner communicated her list orally to CSG COO Derek Anderson, Ms. Bonifacio, and perhaps others.  It is unclear precisely who made the decisions that followed, although the evidence permits the conclusion that Mr. Anderson, Mr. Leon, and Ms. Bonifacio all had some role.  Ms. Gardner, by contrast, seems to have had no role beyond providing her ranked list.  CSG decided that Ms. Saavedra and Ms. Baustert would continue with the MSL team at their same pay rate, but that Mr. Conti would neither remain on the MSL team nor receive the same pay.  He was the only member of the MSL team to suffer that fate.

On June 29, Ms. Bonifacio and human resources representative Ashlie Young met with Mr. Conti.  They explained that in light of the end-of-fiscal-year changes, CSG could not keep him on the MSL team.  They explained that they believed his English skills were not well-suited to the MSL team's upcoming work.  They offered him a job on the "Outbound" team, which would involve making calls exclusively in English.  His work on the Outbound team would pay only $14 per hour.  Ms. Bonifacio explained that the offer was non-negotiable; if Mr. Conti wanted to continue to work at CSG, it would be for the Outbound team at reduced pay.  Mr. Conti asked for time to consider whether to accept the demotion.[2]  CSG gave him until July 6.  Mr. Conti contends that he accused CSG of discrimination during the June 29 meeting.  Ms. Bonifacio contends that his first

---

[2] Mr. Conti reasonably characterizes the offer to work on the Outbound team for reduced pay as a "demotion."  The court notes, however, that it is not clear whether Mr. Conti's job title would have changed along with his work, and it is not clear whether the type of work he would have performed on the Outbound team was less desirable than the work he might have performed on the MSL team.  Acknowledging these uncertainties, the court will nonetheless use the term "demotion" for the sake of simplicity.

ORDER – 5

discrimination accusation (accompanied by a threat to file a complaint with the EEOC) did not come until a day or two later when she spoke with him on the phone.

Mr. Conti did not respond to CSG's offer on July 6, nor did he report to work. On July 7, he arrived at work. The parties dispute important details of that day's events. CSG claims that Mr. Conti left work without clocking out and refused the Outbound team job. Mr. Conti claims that he left work temporarily to visit his ill wife, during which time he (or perhaps his voicemail) received a phone call asking if he would accept the Outbound team job. It is undisputed that he did not accept the job, but the parties dispute whether he affirmatively rejected it. It is undisputed that at 3:30 p.m. on July 7, Ms. Young sent him an email that she had written collaboratively with Mr. Leon. It began "We regret to inform you with this letter that we are terminating your employment at CSG effective immediately." Anderson Decl. (Dkt. # 51), Ex. 11. It stated that CSG had been "pleased with the quality of [his] work as a Spanish speaking Business Partner Expert I," that CSG had offered him Outbound team work as a replacement, and that he had declined. *Id.* Other than a statement that CSG had informed him on June 29 that it "no longer required [his] Spanish speaking capabilities," the sole explanation for the refusal to keep him at his previous rate of pay was as follows:

> We explained that despite the fact that your English speaking skills were not adequate to remain on your current project, we would work to find a new project for you. We explained that the English speaking position would pay $14.00 per hour. We recognize that this represented a significant pay reduction for you. Please understand however that this offer of $14.00 was substantially more than we pay other English speaking agents with the company. We made this offer in an effort to keep you with the company – even though we do not have a specific need for your services at this time.

*Id.* The only basis the email gave for firing Mr. Conti was that he had declined CSG's offer to work on the Outbound team. *Id.*

There is no contemporaneous evidence of a reason for CSG's decision to demote Mr. Conti other than his allegedly inferior English. Since Mr. Conti sued, CSG has

ORDER – 6

offered two alternative justifications.  The first came from Mr. Anderson, who testified at his deposition that CSG's decision was purely economic and that he wishes CSG had done a better job conveying that to Mr. Conti.  That would not explain why CSG moved Mr. Conti from the MSL team, and it would not explain why CSG did not cut the pay of others who made as much as Mr. Conti or nearly as much.  The second belated justification came from Ms. Gardner, who recently explained that she ranked Mr. Conti below Ms. Baustert and Ms. Saavedra not only because of his English proficiency, but because of his knowledge of technology that she thought would be important in the MSL team's upcoming work.  It is not clear when she first offered this new explanation.  It has, however, evolved over time.  In the declaration she submitted in support of CSG's summary judgment motion, she became more precise, explaining that "[l]anguage skills probably played approximately 5% of my decision to not rank Mr. Conti higher . . . ."  Gardner Decl. (Dkt. # 52) ¶ 13.  The other 95%, she declared, was attributable to her belief that the MSL team's upcoming work would require the ability to "navigat[e] multiple websites and applications while maintaining a fluid discussion with a Microsoft partner or customer."  *Id.*  For that reason, she did not think Mr. Conti would be "immediately successful" in the MSL team's upcoming work.  *Id.*

There are reasons a jury might be suspicious of CSG's reasoning.  As the court has noted, Mr. Anderson's purely economic justification does not address why CSG singled out Mr. Conti among other higher-paid employees.  Mr. Conti and his coworkers refute Ms. Gardner's technology-based explanation, asserting that Mr. Conti was as qualified or more qualified than other MSL team members in terms of his use of relevant technology.  And as to both Mr. Anderson's and Ms. Gardner's alternative explanations, a jury might disbelieve them entirely because CSG did not relay them to Mr. Conti when it demoted and then fired him.  A jury might conclude that CSG invented those justifications only after Mr. Conti took legal action.

ORDER – 7

There are several reasons a jury might disbelieve CSG's language-based explanation, which is the only justification that finds support in contemporaneous evidence. First, there is not a shred of evidence that anyone at CSG had concerns about his English skills prior to June 29. At most, Ms. Gardner once commented that Mr. Conti should slow his rate of speech after she reviewed a recording of one of his English-language calls. Everyone who worked with Mr. Conti and provided evidence, a group that includes Ms. Gardner, Ms. Bonifacio, and several of Mr. Conti's MSL teammates, stated that they had no difficulty communicating with him in English. Second, the Outbound team to which CSG proposed to move him made calls exclusively in English, a curious decision to make with regard to an employee whose English skills were in question. Some of the decisionmakers have suggested that the Outbound team made primarily scripted calls, whereas the MSL team was to make complicated unscripted calls in the upcoming fiscal year. Mr. Conti's MSL coworkers uniformly reject that assessment. They contend that their work remained largely unchanged in the fiscal year, that Mr. Conti had already performed that work admirably in English, and that there was no significant difference between the complexity of calls that the MSL team and Outbound team made. Third, the MSL team continued to make phone calls in Spanish.

CSG has evidence supporting its assertion that Mr. Conti was paid more than others on the MSL team. On average, he was. Yet CSG kept both Ms. Baustert (to whom it paid the same hourly wage as Mr. Conti, albeit as an independent contractor) and Ms. Saavedra (to whom it paid just two fewer dollars per hour) on the MSL team and did not reduce their pay. CSG offered no justification, other than Mr. Conti's allegedly inferior English skills, for making him the sole MSL team member (and perhaps the sole employee at CSG) to receive a pay cut. That omission is more glaring in light of a development immediately after CSG made its decisions on June 29. Ms. Saavedra quit working at CSG the next day. Her departure lessened CSG's economic burden, but did not lead it to reconsider its decision to cut Mr. Conti's pay.

ORDER – 8

1   The evidence as to who made the decisions to demote and terminate Mr. Conti is

2   muddled.  There is no dispute that Ms. Gardner played a significant role by submitting

3   her ranked list.  There is no evidence that Ms. Gardner decided to move Mr. Conti from

4   the MSL team or reduce his pay.  The evidence permits the conclusion that some

5   combination of Mr. Anderson, Mr. Leon, and Ms. Bonifacio were responsible for the

6   ultimate decisions.

7        Mr. Conti followed through on his threat to file an EEOC complaint.  After a

8   thorough investigation, the EEOC issued a determination in October 2011 that there was

9   "reasonable cause to believe that [Mr. Conti] was removed from his work assignment,

10  demoted, and compelled to resign his position (constructive discharge), because of his

11  national origin and age in violation of Title VII [of the Civil Rights Act of 1964) and the

12  ADEA [(the Age Discrimination in Employment Act)]."  Blankenship Decl. (Dkt. # 60),

13  Ex. Q.  Mr. Conti has since sued, bringing claims for race and national origin

14  discrimination via Title VII, 42 U.S.C. § 1981, and the Washington Law Against

15  Discrimination.  He also claims age discrimination in violation of the ADEA and the

16  WLAD.  Finally, he claims that CSG unlawfully retaliated against him for accusing it of

17  discrimination and threatening to file an EEOC complaint.

18       Both parties moved for summary judgment.  CSG[3] seeks to dismiss the case in its

19  entirety; Mr. Conti seeks partial summary judgment that CSG is liable as a matter of law

20  for national origin discrimination both in demoting him and in terminating him.  He also

21  asks the court to rule as a matter of law that his refusal to take the lower-paying

22  Outbound team position is not relevant to whether he mitigated his damages.

23

24

25  _____

[3] In addition to CSG, Mr. Conti named Ms. Gardner, Mr. Leon, and Mr. Anderson as Defendants
26  with respect to his § 1981 and WLAD claims.  In this order, the court considers the claims
    against them and CSG collectively because no one has offered any argument differentiating
27  them.  The court will issue a separate order today on the individual Defendants' motion to
    dismiss.

28  ORDER – 9

### III.  ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue of fact for trial.  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party must present probative evidence to support its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The court defers to neither party in resolving purely legal questions.  *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

In employment discrimination cases, the *McDonnell Douglas* burden-shifting analysis augments the summary judgment standard.  *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 658 (9th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  A plaintiff hoping to avoid summary judgment can offer direct or circumstantial evidence that gives rise to an inference of discriminatory intent, or she can follow the three-step path charted in *McDonnell Douglas*.  *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003).  That path requires a plaintiff to establish a prima facie case of discrimination; if she succeeds, the burden shifts to the defendant to produce evidence of a lawful motive for its action; if the defendant succeeds, the plaintiff must produce evidence that the defendant's proffered motive is pretext.  *Id.*  Although the *McDonnell Douglas* framework evolved to address Title VII claims, Washington courts take substantially the same approach to WLAD claims.  *Xieng v. Peoples Nat'l Bank of Wash.*, 844 P.2d 389, 392 (Wash. 1993) (applying Title VII standards to WLAD disparate treatment claim); *Hill v. BCTI Income Fund-I*, 23 P.3d 440,

ORDER – 10

446 (Wash. 2001) ("Washington courts have largely adopted the federal protocol announced in *McDonnell Douglas* for evaluating motions for judgment as a matter of law."). The same standards apply to claims invoking § 1981, which prohibits unlawful discrimination in the enforcement of contracts, including employment contracts. *See Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) (noting that "the same legal principles as those applicable in a Title VII disparate treatment case" apply to § 1981 claims).

**A.   This Case Requires Careful Distinctions Between Race Discrimination, National Origin Discrimination, and Language Discrimination.**

Before applying the *McDonnell Douglas* framework to Mr. Conti's discrimination and retaliation claims, the court addresses two distinctions that inform its analysis of the discrimination claims.

First, Mr. Conti's complaint alleges both race and national origin discrimination. In its summary judgment motion, CSG ignores the race discrimination claims entirely, and Mr. Conti himself scarcely mentions them. Those omissions may not matter much. In the typical case, "the line between discrimination based on ancestry or ethnic characteristics and discrimination based on place or nation of origin is not a bright one." *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring). Often, race and national origin are equivalent, and courts accordingly treat them as such. *Id.* For example, § 1981 refers explicitly only to racial discrimination in the enforcement of contracts, but the Supreme Court applies it to discrimination based on ancestry and ethnic characteristics. *Id.* at 613; *see also Manatt v. Bank of Am., N.A.*, 339 F3d. 792, 798 (9th Cir. 2003) (rejecting defendant's attempt to characterize § 1981 claim as relying solely on national origin discrimination rather than race discrimination). Although Mr. Conti identifies his race as Hispanic, nothing in the motions before the court suggests that animus toward people of that race was a factor in CSG's decision. Ms. Baustert, for example, shares her father's race at least in part, and yet she received more favorable

ORDER – 11

treatment than him.  Because the parties do not distinctly address race discrimination, the court will not do so in this order.  The court expects Mr. Conti to clarify before trial whether he will pursue a distinct claim of race discrimination.

Putting aside his age discrimination claim, the only characteristics that Mr. Conti identifies as the basis for CSG's discrimination are his accent and language ability.  The court uses the phrase "language ability" to mean a person's ability to understand others and to make herself understood in a particular language.  Accent may bear on language ability, but not necessarily.  Some accents make it difficult for a person to make herself understood, some do not.

Employers are free to rely on language ability as a basis for making employment decisions.  If Mr. Conti believes otherwise, he might ask how he would respond to a lawsuit claiming national origin discrimination from a person with rudimentary Spanish skills born in the United States whom CSG turned down for the job for which Mr. Conti applied.  CSG hired Mr. Conti because of his language ability.[4]  Language ability need not have anything to do with national origin.  Ms. Baustert, for example, is apparently an excellent Spanish speaker who was born in the United States.  There are people born in other countries who speak English perfectly; there are people born in the United States who speak English poorly.  There are no doubt cases in which a person's relative facility with English or another language has much to do with the country in which she was born, but the link between national origin and language ability is imperfect at best.  As the court has noted, accent and language ability are related, but not synonymous.  Some people speak perfect English with an accent, some people speak lousy English without an accent.  In some cases, an accent may interfere with others' ability to understand the speaker.  In those cases, an employer seeking to fill a position in which understandability

---

[4] Indeed, the record suggests that CSG hired Mr. Conti in part because of his national origin. CSG did not merely want an excellent Spanish speaker, it wanted "native speakers" who "had a strong sense of the culture [in Latin America] and that would be able to build immediate rapport with the individuals they called."  Gardner Decl. (Dkt. # 52) ¶ 4.

ORDER – 12

was at a premium might prefer an employee without an accent.  But because accent is often tied to national origin in a way that language ability is not, the law is suspicious of decisions based on accent:

> Accent and national origin are obviously inextricably intertwined in many cases.  It would therefore be an easy refuge . . . for an employer unlawfully discriminating against someone based on national origin to state falsely that it was not the person's national origin that caused the employment or promotion problem, but the candidate's inability to measure up to the communication skills demanded by the job.  We encourage a very searching look by the district courts at such a claim.

*Fragrante v. City & County of Honolulu*, 888 F.2d 591, 596 (9th Cir. 1989).

Unsurprisingly, courts who take the "very searching look" that the Ninth Circuit encourages arrive at different results.  For example, in *Xieng*, the court considered the national origin discrimination claim of a Cambodia-born loan officer whose employer had consistently refused to promote him.  821 P.2d at 575, 577.  At a bench trial, the court "concluded that refusing to promote [the plaintiff] because of his Cambodian accent amounted to national origin discrimination because [his] accent did not interfere *materially* with his job performance." *Id.* at 580 (emphasis in original).  It rejected as unworthy of credence the bank's explanation that it had not promoted him because his language ability materially interfered with his performance. *Id.*  Much like Mr. Conti, the employee in *Xieng* consistently had received positive evaluations. *Id.* at 576-77.  Unlike CSG, the employer had at least previously suggested a need for improvement in the employee's English language skills. *Id.* at 576.

*Xieng* drew on *Fragrante*, in which the Ninth Circuit upheld a bench trial decision that a city had not engaged in national origin discrimination when it declined to hire a Filipino-born applicant for a clerk position at the department of motor vehicles.  888 F.2d at 593.  Part of the job involved providing information to the public in person and over the telephone. *Id.*  Both people who interviewed the plaintiff noted a "very pronounced accent" that was difficult to understand and that would have, in their judgment, interfered

ORDER – 13

with his job performance.  *Id.* at 594.  The court held that an "adverse employment decision may be predicated upon an individual's accent when – but only when – it interferes materially with job performance."  *Id.* at 596.  Applying that standard, it held that the trial court had erred neither in deciding that the city's judgment as to the plaintiff's language skill was a legitimate non-discriminatory reason for declining to hire him nor in determining that the decision was not a pretext for national origin discrimination.  *Id.* at 598-99.

To summarize, the law in Washington and the Ninth Circuit regarding accent and language ability discrimination is as follows.[5]  Nothing prevents an employer from making decisions after an "*honest* assessment of the oral communication skills" of an employee when those skills are "reasonably related to job performance."  *Fragrante*, 888 F.2d at 597 (emphasis in original).  But determining whether the employer has made an "*honest*" assessment of communication skill and whether the employer has made a reasonable assessment of whether those skills would "materially interfere" with job performance is a fact-intensive inquiry.  That inquiry is typically ill-suited for summary judgment, as this case illustrates.  The disputes in the record over Mr. Conti's language ability and accent are by themselves fatal to much of the parties' requests for summary judgment.

**B.    Mr. Conti Avoids Summary Judgment On His National Origin Discrimination Claims.**

A prima facie case of employment discrimination has four elements.  The employee must show that she belongs to a protected class, that she was "performing according to her employer's legitimate expectations," that she "suffered an adverse employment action," and that "other employees with qualifications similar to her own

---

[5] As Mr. Conti points out, some courts have adopted a different approach to accent discrimination.  In the Sixth Circuit, for example, employment decisions explicitly based on accent are presumptively discriminatory.  *In re Rodriguez (Gold v. Fedex Freight East, Inc.)*, 487 F.3d 1001, 1009 (6th Cir. 2007).  An employer can avoid liability only by proving that it would have made the same decision had it not considered the employee's accent.  *Id.* at 1010.

ORDER – 14

were treated more favorably." *Vasquez*, 349 F.3d at 640 n. 5 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)).  In opposing summary judgment, an employee's evidentiary burden in establishing a prima facie case is not onerous.  *Aragon*, 292 F.3d at 659 ("[T]he requisite degree of proof necessary to establish a prima facie case for Title VII … on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.") (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).  That Mr. Conti is in a protected class and suffered an adverse employment action is not in dispute.  The court notes, however, that CSG repeatedly fails to acknowledge that Mr. Conti suffered two adverse employment actions.  First, CSG moved him to a different job with lower pay.  Second, it fired him.[6]  Those adverse actions may well flow from the same CSG decision, but as the court will discuss, they are separately actionable.

There is ample evidence demonstrating that Mr. Conti was performing to CSG's expectations.  CSG can hardly contend otherwise; everyone who directly supervised or worked with Mr. Conti had nothing to offer but praise.  A jury could reject CSG's attempt to distinguish its own positive reviews of Mr. Conti by explaining that it was pleased with his Spanish-speaking work but not his English-speaking work.  Until CSG fired him, there is no evidence at all that it was dissatisfied with his English-speaking

---

[6] Perhaps the reason that CSG does not acknowledge its decision to fire Mr. Conti as a separate adverse employment action is that it does not admit that it fired him.  That position is difficult to understand, given that the email CSG sent on July 7 began as follows: "We regret to inform you with this letter that we are terminating your employment at CSG effective immediately." Curiously, CSG now takes the position that Mr. Conti resigned.  Building on that position, CSG contends that Mr. Conti must prove that he was constructively discharged from his job in order to win damages.  *See Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (explaining that an employee who resigns can prove constructive discharge only by proving that her working conditions were "so intolerable that a reasonable person in the employee's position would have felt compelled to resign").  The court is tempted to grant summary judgment disposing of both contentions.  The court is aware of no evidence that would permit the jury to conclude that Mr. Conti resigned, and thus is aware of no basis to put the issue of constructive discharge in front of the jury.  It is not clear, however, if Mr. Conti has actually requested summary judgment that he was terminated.  He might prefer to let CSG attempt to convince the jury that he resigned, despite the letter terminating him.  CSG can clarify in its pretrial submissions whether it intends to argue at trial that it did not terminate Mr. Conti; Mr. Conti can clarify in his pretrial submissions whether he would like the court to enter summary judgment.

ORDER – 15

work.  Each of his coworkers who provided evidence reject the notion that Mr. Conti's English was in any way deficient.

There is also evidence that other employees with similar qualifications were treated more favorably than Mr. Conti.  Putting aside CSG's questionable characterization of Mr. Conti's English skills, the evidence permits the conclusion that Mr. Conti was at least as qualified as Ms. Baustert and unquestionably more experienced.  Yet she remained on the MSL team and received no pay cut.

CSG also contends that Mr. Conti cannot make out a prima facie case because it eliminated his position rather than removing him from that position and filling it with another worker.  When an employer eliminates a job for nondiscriminatory reasons, the employee holding that job may have no basis to claim discrimination even if she is in a protected class.  *See Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421-22 (9th Cir. 1990).  But CSG stretches *Rose* beyond its breaking point.  In *Rose*, the court held that the post-merger elimination of an employee's "unique function" meant that the employee (who claimed age discrimination) could not show that he was replaced with a younger worker.  *Id.* at 1422.  That was not, however, fatal to his discrimination claim.  He retained the option to come forward with additional evidence that his age was a factor in the decision.  *Id.*  Moreover, the decision in *Rose* depended on the employee's "unique function," because once that function was eliminated, there was no need for an employee with his skill set.  *Id.* at 1421.  Mr. Conti's circumstances are easy to distinguish.  He did not serve a "unique function" at CSG.  Even if the court were to confine his job to the Latin-American project (and the evidence permits the conclusion that it would be inaccurate to do so), at least two other employees served the same function.  But when that function disappeared, CSG chose Ms. Baustert (who had no accent) over Mr. Conti.  And although the record is unclear as to whether Ms. Saavedra spoke English with an accent, she also kept her job whereas Mr. Conti did not.  Mr. Conti did not lose his position on the MSL team because CSG eliminated it; he lost it because CSG chose to remove him from it.

ORDER – 16

At step two of the *McDonnell Douglas* analysis, CSG meets its burden to offer evidence of a legitimate and non-discriminatory reason for its decision to demote Mr. Conti.  CSG harps on the changes it imposed in the wake of Microsoft's new fiscal year plans.  Those changes are a legitimate and non-discriminatory reason to make changes at CSG, but they are no reason at all for CSG's choice to target Mr. Conti.  For that choice, CSG's first proffered non-discriminatory motive is its belief that Mr. Conti's English skills were not adequate to continue on the MSL team.  As the court has already discussed, a jury could believe that explanation, and could, consistent with *Fragrante*, determine that it is not discriminatory.  For that reason, the court need not consider (at least at step two) CSG's after-the-fact justifications for the decision, including Mr. Anderson's contention that the demotion was purely for economic reasons and Ms. Gardner's explanation that she ranked Mr. Conti poorly mostly because of his lack of technological proficiency.

Finally, Mr. Conti has provided evidence that CSG's proffered explanations were pretext.  Most notably, there is no evidence at all, until the day CSG demoted him, that anyone was dissatisfied with his English skills.  There is evidence that he had capably performed the same job duties, in English, that the MSL team continued to perform in the new fiscal year.  There is evidence that CSG declined to demote similarly situated employees who did not have an accent.  In short, a jury might disbelieve CSG's language-based explanation, which in this case would be reason enough to believe that it was Mr. Conti's national origin, not his language ability, that led CSG to demote him. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 123, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.") A jury could "reasonably infer from the falsity of the explanation that [CSG] is dissembling to cover up a discriminatory purpose." *Id.*; *see also Hill*, 23 P.3d at 448 ("[W]e hold that while a *McDonnell Douglas* prima facie case, plus evidence sufficient to

ORDER – 17

disbelieve the employer's explanation, will *ordinarily* suffice to require determination of the true reason for the adverse employment action by a fact finder in the context of a full trial, that will not always be the case.").

A jury could also conclude that the justifications CSG has not supported with contemporaneous evidence are pretextual. Mr. Anderson's attempt to justify CSG's decision as purely economic might address Mr. Conti's pay cut, but it does not explain CSG's decision to single out Mr. Conti for the pay cut or its decision to move him off the MSL team. A jury could find his explanation pretextual. A jury could conclude that Ms. Gardner's technology-based justification for her rankings is pretextual simply because she did not announce it until after Mr. Conti took legal action.

As to CSG's decision to fire Mr. Conti, a jury could find that to be simply an extension of the discriminatory decision to give him a take-it-or-leave-it demotion. Alternatively, if the jury finds the demotion to be non-discriminatory, it could find that CSG reasonably chose to terminate an employee who refused to accept new pay and new work. Regardless, disputed issues of material fact prevent the court from determining whether his termination was discriminatory.

Mr. Conti has satisfied the requirements of the *McDonnell Douglas* framework and has thus avoided summary judgment on his national origin discrimination claims as applied to CSG's decision to demote him and to terminate him. It remains to consider whether he can make the same showing as to his claims of age discrimination and retaliation.

**C.      Mr. Conti Avoids Summary Judgment On His Retaliation and Age Discrimination Claims.**

Each of the laws that Mr. Conti invokes prohibits employers from retaliating against employees who engage in protected activities. *See* 42 U.S.C.§ 2000e; RCW § 49.60.210(1); *Manatt*, 339 F.3d at 800-01 (confirming that § 1981 prohibits retaliation). Protected activities include allegations of discrimination and threats to take legal action.

ORDER – 18

*Manatt*, 339 F.3d at 800; *Short v. Battle Ground Sch. Dist.*, 279 P.3d 902, 912 (Wash. Ct. App. 2012). There is no evidence that Mr. Conti engaged in protected activity before CSG demoted him, and he does not argue otherwise. He did, however, raise allegations of discrimination and threaten to file an EEOC complaint once CSG announced the demotion. Given the close proximity of Mr. Conti's threats and CSG's decision to terminate him, a jury could find that the decision to fire Mr. Conti was retaliatory. *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011) ("In some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext."). *Estevez v. Faculty Club*, 120 P.3d 579, 590 (Wash. Ct. App. 2005) ("Proximity in time between the discharge and the protected activity, as well as satisfactory work performance and evaluations prior to the discharge, are both factors that suggest retaliatory motivation."). For these reasons, the court cannot enter summary judgment against Mr. Conti's retaliation claim.

Mr. Conti's age discrimination claims present a much closer case than his claims of national origin discrimination. For reasons the court has already discussed, a jury could conclude that when CSG justified its decision to fire Mr. Conti for his allegedly deficient English, it actually made the decision because of his accent (and thus his national origin) rather than any actual communicative difficulty. But CSG did not overtly announce any justification for its decisions that are tied to a proxy for Mr. Conti's age. As to claims of age discrimination, Mr. Conti's best evidence is purely circumstantial: he was substantially older than everyone on the MSL team. That evidence suffices to make out a prima facie case of age discrimination. As the court has already discussed, CSG has offered evidence permitting the conclusion that it made its decisions for reasons other than age. As to step three of the *McDonnell Douglas* analysis, Mr. Conti has submitted evidence from which a jury could conclude that CSG's proffered explanations for demoting and firing him are pretexts masking age discrimination. As noted, there is

ORDER – 19

evidence from which a jury could conclude that CSG's explanations were knowingly false.  If so, the jury could conclude from the evidence that CSG's true motivation was to eliminate the only older employee from its phone agent workforce.

**D.    A Jury Must Decide to What Extent the Same-Actor Inference Benefits CSG.**

Before leaving the *McDonnell Douglas* framework behind, the court considers CSG's contention that the same-actor inference supports the entry of summary judgment. In its most extensive discussion of the issue, the Ninth Circuit in *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090 (9th Cir. 2005), attributed the same-actor inference to *Bradley v. Harcourt, Brace & Co.*, where the court held as follows:

> [W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action.

104 F.3d 267, 270-71 (9th Cir. 1996) (quoted in *Coghlan*, 413 F.3d at 1096).  The *Coghlan* court charted a district court's course when applying the same-actor inference on summary judgment:

> The same-actor inference is neither a mandatory presumption (on one hand) nor a mere possible conclusion for the jury to draw (on the other).  Rather, it is a "strong inference" that a court must take into account on a summary judgment motion. . . . [A court] must consider then, whether [a plaintiff] has made out the strong case of bias necessary to overcome this inference.

413 F.3d at 1098.  Although Washington law recognizes the same-actor inference, the court is aware of no published decision of a Washington court applying the inference in resolving a summary judgment motion.  In *Griffith v. Schnitzer Steel Indus., Inc.*, the court invoked the inference in setting aside a jury's verdict in favor of a discrimination plaintiff.  115 P.3d 1065, 1073-74 (Wash. Ct. App. 2005).  The same was true in *Hill*, where the court phrased the effect of the same-actor inference as follows:

> For a plaintiff to prevail [where the same-actor inference applies], the evidence must answer the obvious question: if the employer is opposed to employing persons with a certain attribute, why would the employer have hired such a person in the first place?

23 P.3d at 450 (finding that "[t]he record here fails even to suggest an answer").

ORDER – 20

In this case, the application of the same-actor inference is not straightforward.  Ms. Gardner, and Ms. Gardner alone, hired Mr. Conti.  As to the adverse actions that have led to this lawsuit, however, she was merely the first link in a chain of decisions.  She ranked the MSL employees; she did not recommend action based on those rankings.  Others at CSG, including Mr. Anderson, Mr. Leon, and Ms. Bonifacio, made the decision to demote Mr. Conti and later to fire him.  In these circumstances, it is questionable whether the same-actor inference applies.  Even if it does, a jury might apply the same actor inference in a limited way: it might reasonably query why Ms. Gardner would hire Mr. Conti, aware of his age and national origin, only to rank him below other employees because of his age or his national origin.  But even if the jury answered that question in a manner that favored Ms. Gardner, it would not prohibit the jury from deciding that the people who made the decision to take adverse action against Mr. Conti had discriminatory motive.  In short, the jury must decide to what extent the same actor inference benefits CSG in this case.

**E.      Except in One Respect, Mr. Conti is Not Entitled to Summary Judgment.**

The *McDonnell Douglas* framework determines whether to grant summary judgment to a defendant.  A plaintiff seeking summary judgment bears a greater burden than *McDonnell Douglas* imposes.  The minimal evidentiary burden required to make a prima facie case of discrimination is a far cry from the burden of showing that no reasonable jury could conclude that the defendant took an adverse action for a non-discriminatory reason.  Similarly, the burden to produce evidence that the defendant's proffered lawful motive is pretextual is appropriate when avoiding summary judgment; a plaintiff hoping to win summary judgment must show that no reasonable jury could conclude that the motive is anything but pretext.

For reasons the court has already discussed, it cannot grant summary judgment that CSG discriminated based on national origin.  A jury could conclude that CSG's

ORDER – 21

decision was motivated purely by Mr. Conti's language ability, not by his accent or any characteristic associated with his national origin.

The only other aspect of Mr. Conti's motion for summary judgment is a request that the court rule as a matter of law that his failure to accept the Outbound team job at $14 per hour is not evidence that he failed to mitigate his damages. The Ninth Circuit's decision in *EEOC v. Pape Lift, Inc.*, 115 F.3d 676 (9th Cir. 1997), dictates much of the court's ruling on this issue. In *Pape Lift*, the court considered a district court ruling eliminating a jury's front pay award following a trial in which the jury held the defendant liable for age discrimination in terminating the plaintiff. *Id.* at 679. The district court credited the defendant's evidence that there were jobs available to the plaintiff after his termination, but that he did not pursue them. *Id.* at 682-83. Reversing, the Ninth Circuit explained that the jobs to which the defendant pointed were either "substantially dissimilar to [the plaintiff's] previous employment" or "had salaries lower than that of his old job." *Id.* at 683. The court rejected as "untenable" the argument that a plaintiff is obligated to "accept a position similar to the one he held previously, but which offers a significantly lower salary." *Id.* The only distinction between Mr. Conti's circumstances and those in *Pape Lift* is that the position available to Mr. Conti was instantly available to him at the same company that had demoted him. CSG has offered no argument explaining why an employee is any more obligated to accept a lower-paying position with his current employer than he is with a new employer. The court rules as a matter of law that Mr. Conti's failure to accept the Outbound team job is not relevant to the mitigation of damages on his Title VII claim. Although Mr. Conti cites no authority that explicitly addresses whether the reasoning in *Pape Lift* should apply to his WLAD and § 1981 claims, CSG has cited no authority to the contrary. The court rules that Mr. Conti's failure to accept his demotion is not relevant, as a matter of law, to his failure to mitigate damages on any of his claims.

ORDER – 22

## IV.  CONCLUSION

For the reasons stated above, the court DENIES the parties' summary judgment motions (Dkt. ## 49, 54) in all but one respect.  The court rules that, as a matter of law, Mr. Conti's failure to accept the Outbound team job is not relevant to whether he mitigated damages.

The parties have already been apprised that the court cannot begin their trial on June 17, as scheduled.  At present, the court has first-priority trials or other commitments scheduled from June 24 through August 16.  Accordingly, the parties must choose one of the following options.  They may either begin trial on June 10 (with the understanding that trial will conclude no later than June 19), or they may choose a trial date on or after August 19.  If the parties prefer, the court can make this case the first priority for any of the weeks between June 24 and August 16 in the event that one of the pre-scheduled trials does not occur.

The parties must jointly notify the court of their decision on the June 10 trial date no later than 4:00 p.m. on May 28.  If they choose to go to trial, motions in limine will be due no later than 4:00 p.m. on May 30, with responses due by 4:00 p.m. on June 5, and all other pretrial filings (including jury instructions, trial briefs, proposed voir dire, and a joint pretrial order due no later than 4:00 p.m. on June 6.

Dated this 24th day of May, 2013.

_Richard A. Jones_
_____

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 23