HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL CONTI,

            Plaintiff,

   v.

CORPORATE SERVICES GROUP, INC.,
et al.,

            Defendants.

CASE NO. C12-245RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on a slew of motions following an eight-day jury trial.  Both Plaintiff Michael Conti and Defendants Jay Leon and Corporate Services Group, Inc. ("CSG") have requested oral argument on at least one of those motions, but the court finds oral argument unnecessary in light of the parties' extensive briefing and the evidentiary record already available to the court.  For the reasons stated below, the court rules as follows:

1)  The court DENIES Defendants' renewed motion for judgment as a matter of law and their motion for a new trial.  Dkt. ## 219, 221.

2)  The court DENIES Mr. Conti's motion for relief from the court's December 17, 2013 judgment on the jury's verdict.  Dkt. # 234.

ORDER – 1

3) The court GRANTS Mr. Conti's motion for attorney fees, costs, and prejudgment interest, but awards substantially less than Mr. Conti requested. Dkt. # 193.

4) The court GRANTS Mr. Conti's motion to supplement the record supporting his attorney fee motion, but does so solely because the court's consideration of the additional evidence Mr. Conti submitted causes no prejudice to Defendants. Dkt. # 248.

## II.   BACKGROUND

Mr. Conti worked at CSG, which operates telephone call centers for corporate clients, for just six months. There is no dispute that CSG hired Mr. Conti because he spoke fluent Spanish and because he was a native of Colombia. When CSG hired Mr. Conti in January 2010, it was about to embark on a six-month pilot project for Microsoft, placing calls to customers in Latin America. CSG chose Mr. Conti, along with a native Brazilian Portuguese speaker, to make those calls. They paid him and the Portuguese speaker substantially more than representatives who spoke only English. Nonetheless, Mr. Conti's employment was not expressly tied to the Latin-American project. CSG placed him on the "MSL" team, a team of employees working on various Microsoft projects. At the time, the other projects consisted primarily or entirely of placing calls in English. Early in his employment, Mr. Conti assisted the MSL team with English calls while he and the Portuguese speaker waited for the Latin-American project to ramp up. There is no question that Mr. Conti speaks English with a noticeable accent; the evidence at trial (not to mention Mr. Conti's accented trial testimony) convincingly demonstrated that his accent did not interfere with his ability to communicate in English.

Microsoft chose not to extend the Latin-American project. That decision came along with a series of decisions Microsoft made about its contracts with CSG at the end of Microsoft's fiscal year in June 2010. About 90% of CSG's work was on Microsoft's behalf, and CSG had much experience with Microsoft's end-of-fiscal-year reshuffling,

ORDER – 2

which it referred to as "the gap."  In past years, CSG had laid off employees as part of restructuring to accommodate Microsoft's changing needs during the gap.  In 2010, CSG CEO Jay Leon instructed his subordinates not to lay off any call center employees as a result of the gap.  His subordinates followed his instructions.  CSG transferred more than 30 call center employees, the majority of its call center work force, to different positions as a result of the gap.

Mr. Conti was among the call center employees who CSG decided to transfer.  On June 29, 2010, CSG informed Mr. Conti that he would be transferred off the MSL team and onto the "Outbound" team.  It also informed him that his pay would be cut from the $20 hourly rate he had enjoyed since he began working at CSG to $14 per hour.  The only reason that CSG ever gave Mr. Conti for his transfer was that his English-speaking skills were not adequate to remain on the MSL team.  Mr. Conti immediately protested, asked to remain on the MSL team, and asked that his pay not be cut.  CSG refused his requests.  For the remainder of that week (which was the week preceding the Fourth of July holiday), he continued to work with the MSL team.  CSG had asked him to accept or reject his Outbound team job by July 6.  He had not yet told CSG anything when he came to work on July 7.  He had intended to meet with CSG that day to give them his decision, but he received word that his wife was ill.  He spoke to one of his supervisors to tell her that he needed to leave work to attend to his wife, and asked that CSG reschedule its meeting with him until the following day.  His supervisor agreed, and Mr. Conti left.

That day, while Mr. Conti was with his wife, CSG sent him an email firing him. As was the case when CSG first announced his transfer to the Outbound team, the only reason CSG provided in the email for that decision was that Mr. Conti's English skills were not adequate to remain on the MSL team.  The email stated, without any reference to CSG's agreement to postpone its meeting about Mr. Conti's decision as to the Outbound job, that Mr. Conti had declined the Outbound job.

ORDER – 3

1     Mr. Conti sued.  He alleged that CSG discriminated against him on the basis of his

2  race and national origin and age (virtually all of CSG's other call center employees,

3  including those on the MSL team, were much younger than him).  He also contended that

4  CSG had retaliated against him because during the June 29 meeting in which CSG

5  informed him of his transfer and pay cut, he told CSG that it was discriminating against

6  him and that he would complain to the Equal Opportunity Employment Commission

7  ("EEOC").  He invoked Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and

8  the Washington Law Against Discrimination ("WLAD").  Initially, he sued only CSG.

9  By the time he filed his third amended complaint, he had also sued three individuals: Mr.

10  Leon; Derek Anderson, who was Mr. Leon's second-in-command; and Stacey Gardner,

11  the woman who hired Mr. Conti and who directly supervised him for at least the first half

12  of his employment at CSG.

13     The court has referred generically to CSG as the entity who took actions adverse

14  to Mr. Conti, but a corporation acts only through its agents.  In this case, many CSG

15  employees played a role in the adverse employment actions against Mr. Conti.  Ms.

16  Gardner, who was no longer Mr. Conti's day-to-day supervisor by the time "the gap"

17  arrived in June 2010, listed the MSL employees she hoped would remain on the team.

18  She did not include Mr. Conti, although she was generally pleased with his performance.

19  Her involvement in Mr. Conti's fate ended there.  Some combination of Mr. Leon, Mr.

20  Anderson, Analyn Bonifacio (who took over Ms. Gardner's role as day-to-day supervisor

21  of the MSL team at the end of March 2010), and Briana Pelton (who also played a

22  supervisory role beneath Ms. Gardner and Ms. Bonifacio) made the decision to transfer

23  Mr. Conti to the Outbound team and to reduce his pay.  Ms. Bonifacio and Mr. Leon

24  (with help from a human resources employee named Ashlie Young) were involved in the

25  decision to terminate Mr. Conti.  Mr. Leon, as the CEO, had the ultimate authority to

26  make that decision, and the evidence showed that he participated directly in that decision.

27

28  ORDER – 4

Most of Mr. Conti's claims survived contentious pretrial litigation, and the court held a trial consisting of about six days of testimony and evidence, a half day devoted to jury selection, and a half day devoted to jury instructions and closing arguments.  Mr. Conti voluntarily dismissed his claims against Mr. Anderson before trial began, and he dismissed his claims against Ms. Gardner at the close of evidence.

The jury reached a mixed verdict.  It concluded that no one had discriminated against Mr. Conti on the basis of his age and that no one had retaliated against him.  It also concluded, however, that both CSG and Mr. Leon had discriminated against him on the basis of his race or national origin.  It found, however, that both Mr. Leon and CSG would have made the same decisions about Mr. Conti even if they had not discriminated against him on the basis of his race or national origin.  The jury awarded Mr. Conti $20,000 in lost wages and benefits (the equivalent of about six months of pay at Mr. Conti's $20 hourly wage), plus $170,000 in emotional damages.[1]  It found that Mr. Leon had proximately caused none of Mr. Conti's economic damages, and just $10,000 of his emotional damages.  After requesting the parties' input on the form of judgment, the court directed the entry of a judgment on December 17, 2013, making CSG liable for $190,000 and Mr. Leon jointly and severally liable for $10,000 of that amount.

Now before the court are five post-trial motions.  Mr. Conti asked the court to award him more than $1.4 million in attorney fees in costs, then recently moved for leave to supplement the record supporting his fee request.  Defendants ask the court to enter judgment as a matter of law in their favor, or in the alternative to order a new trial.  Mr. Conti has asked the court to amend the judgment so that Mr. Leon is jointly and severally liable with CSG for *all* of Mr. Conti's damages, not just $10,000 of those damages.

---

[1] The jury's precise awards were $20,160 in lost wages and benefits and $170,625.12 in emotional damages.  Where possible, the court will use rounded numbers for simplicity.

ORDER – 5

### III.   SUMMARY OF RULINGS

Defendants' motions raise legal issues, issues arising from the alleged misconduct of Mr. Conti's counsel at trial, issues arising from the court's allegedly erroneous rulings excluding evidence, and challenges to the evidence supporting the verdict.

In Part IV.A of this order, the court will consider sufficiency of the evidence.  It will conclude that there was ample evidence to support the jury's verdict.

The court will then consider, in Part IV.B, whether either the court's evidentiary rulings, Mr. Conti's counsel's behavior, or anything else serves to undermine the court's confidence in the jury's verdict and warrant a new trial.  The court concludes that any erroneous evidentiary ruling or misconduct of counsel was harmless, and that Defendants' additional arguments for a new trial are not persuasive.

The bulk of this order will address the legal issues that both parties raise. Defendants' motion for judgment as a matter of law insists that the jury's finding that both Defendants would have made the same decisions about Mr. Conti even if they had not discriminated against him means, at a minimum, that Defendants cannot be liable for damages.  Everyone concedes that they are right as a matter of federal law.  The question is whether the result is the same as to Mr. Conti's WLAD claims.  For the reasons stated in Part V of this order, the court will conclude that Defendants' failure to request jury instructions as to the WLAD version of this so-called "same-decision defense" is fatal to their efforts to undo the jury's damage verdict.  In Part VI of this order, the court will conclude that the law does not support Mr. Conti's request to make Mr. Leon jointly and severally liable for all of the damages the jury awarded against CSG.

Finally, in Part VII, the court will consider Mr. Conti's attorney fees and cost motion.  He is a prevailing party, at least in part, and he is entitled to fees and costs.  His request for more than $1.4 million in attorney fees, however, is excessive because of his limited success and because of his counsel's excessive work to obtain that limited success.  The court awards attorney fees of $433,000 and costs of $15,000.

ORDER – 6

## IV.   JUDGMENT AS A MATTER OF LAW OR NEW TRIAL

Defendants invoke Rule 50(b) of the Federal Rules of Civil Procedure, renewing the motion for judgment as a matter of law that they made at the close of the presentation of evidence.  In the alternative, they invoke Rule 59(a) to request a new trial.

**A.      The Court Will Not Enter Judgment as a Matter of Law Based on Insufficient Evidence.**

When considering a Rule 50(b) motion, the court must uphold the jury's verdict as long as there was any legally sufficient basis to support it.  *Experience Hendrix, L.L.C. v. Hendrixlicensing.com Ltd.*, 742 F.3d 377, 390 (9th Cir. 2014).  The court must consider all of the evidence in the record, must draw all reasonable inferences in favor of the nonmoving party, and may not make any credibility determinations or reweigh the evidence.  *Id.*  The court must uphold a jury's verdict if "substantial evidence" supports it.  *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001).  Substantial evidence is evidence adequate to support a jury's conclusion, even if the jury could also have drawn different conclusions from the same evidence.  *Id.*  The court cannot substitute its view (or the moving party's view) of the evidence for the view of the jury.  *Id.*

The court will not dwell long on Defendants' attack on the sufficiency of the evidence.  The court is satisfied that the jury had ample evidence on which to base its verdict.  The court briefly addresses Defendants' principal contentions.

First, there was sufficient evidence that Mr. Leon was aware of Mr. Conti's national origin or race when he made his decisions.  Defendants harp on Mr. Conti's admission that he never had a conversation with Mr. Leon, but they ignore the evidence that before the end of June 2010, Mr. Conti exchanged pleasantries with Mr. Leon in the office on several occasions, and that they interacted at a CSG cooking competition.  The jury could have concluded that Mr. Leon could observe that Mr. Conti had Hispanic ancestry, and heard Mr. Conti's accent in even the brief interactions they had before June 2010.  Moreover, there is no question that Mr. Leon was aware at the end of June 2010

ORDER – 7

that at least one of CSG's purported reasons for terminating Mr. Conti was his alleged weakness in communicating in English.  Among other things, Mr. Leon co-authored Mr. Conti's termination letter, which repeated the assertion that Mr. Conti's English skills were inadequate to permit him to remain with the MSL team.  The jury had a wealth of evidence from which it could conclude that Mr. Conti's accent did not interfere with his ability to speak English, and that Mr. Leon's insistence to the contrary was evidence of race or national origin discrimination.

Second, although there was evidence that CSG had a practice of paying call center employees a premium when they were working on projects in which they spoke languages other than English, while reducing their pay on English-speaking projects, there was also evidence from which the jury could conclude that CSG's decision to reduce Mr. Conti's pay was discriminatory.  Putting that aside, CSG's reduction in Mr. Conti's pay was just one of the adverse actions it took against Mr. Conti.  It also fired him.  Moreover, there was evidence that when the native Portuguese speaker quit on June 30, CSG refused to give Mr. Conti her spot on the MSL team.  There was sufficient evidence for the jury to conclude that any or all of these actions were motivated, at least in part, by discrimination.

Defendants are mistaken in their belief that it makes any difference that CSG treated others who spoke accented English or who had Latin-American ancestry more favorably than Mr. Conti.  There was evidence that both Mr. Conti's daughter (who was born in the United States to Colombian parents, but spoke unaccented English) and the native Portuguese speaker were left on the MSL team despite the reshuffling at the end of June 2010.  But, as this court has previously explained, no employer can escape a finding of discrimination simply by pointing to employees it did not discriminate against.  *See Creekmore v. U.S. Bank, N.A.*, No. C09-561RAJ, 2010 U.S. Dist. LEXIS 81696, at *10-13 (W.D. Wash. Aug. 12, 2010).  The evidence permitted the jury to find that Defendants

ORDER – 8

discriminated against Mr. Conti even if they did not discriminate against Mr. Conti's daughter or the native Portuguese speaker.

Finally, the jury had ample evidence to decide that Defendants discriminated despite what they call "legitimate business reasons" for their decisions with respect to Mr. Conti. Perhaps the most powerful evidence for not solely crediting Defendants' legitimate explanations is that they came much too late. When Defendants transferred Mr. Conti, reduced his pay, and then terminated him, the only reason they offered to Mr. Conti was his supposed weakness in communicating in English. Putting that aside, the jury weighed Defendants' legitimate motives and credited them. As the court discusses at length in Part V, the jury ruled that those legitimate motives would have led Defendants to take the same actions against Mr. Conti even if they had not discriminated. That conclusion, however, does not undermine the jury's conclusion that Defendants also discriminated against Mr. Conti.

Putting aside Defendants' plea of insufficient evidence, their motion for judgment as a matter of law is premised on their claim that the jury's finding that they would have made the same decisions about Mr. Conti even if they had not discriminated means that the court must set aside the jury's damages award. The court will consider that contention at length in Part V.

## B.    The Court Will Not Order a New Trial.

A court can grant a motion for a new trial for a variety of reasons, all of which are intended to ensure that the trial court can "prevent a miscarriage of justice." *Experience Hendrix*, 742 F.3d at 390. The court can weigh the evidence and grant a new trial if the jury's verdict was a against the clear weight of the evidence. It can grant a new trial as a result of an erroneous evidentiary ruling, but only if that ruling "substantially prejudiced" a party. *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995); Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is ground for granting a new

ORDER – 9

trial . . . .").  It can grant a new trial where an attorney's misconduct sufficiently permeates the trial such that the court is convinced that the jury reached its verdict under the influence of passion or prejudice.  *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995).  Regardless of the grounds asserted for a new trial, the court has substantial discretion in denying a new trial, and it should grant one only where it is convinced that a miscarriage of justice has occurred.  *Experience Hendrix*, 742 F.3d at 390 ("We afford considerable deference to the district court's new trial decision . . . ."); *Hemmings*, 285 F.3d at 1192 (noting that trial court is in best position to gauge the prejudicial impact of attorney misconduct); Fed. R. Civ. P. 61 ("[T]he court must disregard all errors and defects that do not affect any party's substantial rights.").

With these standards in mind, the court begins by stating that it is convinced that the jury's verdict in this case was no miscarriage of justice.  The jury weighed the evidence and came to a verdict that the evidence comfortably supports.  The jury rejected some of Mr. Conti's claims and ruled in his favor on others.  A different jury might have decided otherwise, but the court emphasizes "might."  The evidence neither compelled a result in Mr. Conti's favor nor in any Defendant's favor.  Moreover, the court's judgment in this regard would be the same even if every evidentiary "error" to which Defendants point had not occurred and even if none of the "misconduct" of Mr. Conti's lead counsel had occurred.  Defendants' contentions regarding unfair timekeeping during trial, improper jury instructions, and excessive damages fall well short of convincing the court that there is a basis for a new trial.

### 1.    The Jury's Verdict Was Not Against the Weight of the Evidence.

The court will not grant a new trial because of allegedly insufficient evidence to support the jury's verdict.  Were the court to weigh all of the evidence on its own and make its own evidentiary determination, it would have arrived at the same verdict that the jury reached.  Ultimately, Defendants' decision to identify Mr. Conti's English-speaking

ORDER – 10

ability as a basis for taking action against him is more than enough evidence of a discriminatory motive.  Defendants had legitimate motives for making employment decisions to bridge "the gap," but the jury could reasonably have concluded that defendants who were not discriminating would have focused on those motives when communicating their decisions Mr. Conti, rather than pinning his transfer and pay cut on his allegedly inadequate English-speaking skills.  In addition, the evidence supported a conclusion that Defendants' decision to fire Mr. Conti on July 7 rather than to give him the benefit of their offer to allow him an extra day to decide whether to accept his new job was not the product of any legitimate motive.  The court will not second-guess the jury's apparent decision that discrimination motivated that decision as well.

## 2.   Defendants Have Not Pointed to A Prejudicial Evidentiary Ruling.

The court finds no merit in Defendants' insistence that any alleged erroneous evidentiary rulings, whether considered individually or cumulatively, warrant a new trial. The court now briefly discusses some of those alleged errors.

Defendants point out that the court ruled, on hearsay grounds, that their witnesses could not testify that Microsoft employee John Schoenstein complained about Mr. Conti's performance.  The record as to what Mr. Schoenstein might have said if he had testified is muddy at best, and it is not clear which party would have benefitted most had it heard more evidence about his views.  What is not muddy is that both parties failed to call him as a witness, even though he was available.  Moreover, because Mr. Conti's lead counsel insisted in cross-examination on asking questions that opened the door to testimony about what Mr. Schoenstein said to CSG employees about Mr. Conti, the jury heard testimony about Mr. Schoenstein's comments that favored Defendants.  For example, the court did not strike testimony from Mr. Leon that he "knew that Microsoft said that they didn't want [Mr. Conti] on the team."  The court denied Mr. Conti's belated effort to use Mr. Schoenstein's deposition testimony in rebuttal to remedy lead counsel's mistake.  In other words, the jury heard evidence that Mr. Schoenstein had concerns

ORDER – 11

about Mr. Conti's performance, and reached their verdict against Defendants nonetheless. Again, the jury concluded that Defendants had both legitimate and discriminatory motives for taking action against Mr. Conti.  Having considered all the evidence, the court does not believe it likely that the jury would have reached no verdict more favorable to Defendants had Mr. Schoenstein testified.

Defendants' insistence that Mr. Conti gained an advantage because the court prevented them from elaborating on Mr. Conti's daughter's birthplace and childhood is meritless.  The jury knew that she was born to parents of Colombian heritage, that she spoke fluent English and Spanish, and that unlike her father, she did not speak accented English.  Nothing else was relevant.

Defendants' contention that they were prejudiced because both Mr. Conti and his daughter cried during portions of her testimony is specious.  Moreover, although the court does not dispute that Mr. Conti and his daughter cried at least briefly, the court notes that Defendants' counsel neither objected at the time nor requested at a sidebar that the record reflect the extent of any crying.  Defendants have not preserved any objection on this issue.

Defendants do not convince the court that they suffered prejudice from the court's exclusion of evidence about Mr. Conti's employment or business setbacks that preceded and postdated his employment at CSG.  The evidence, including the testimony of all of Mr. Conti's supervisors, was that Mr. Conti was an excellent employee at CSG. Evidence that he had less success elsewhere was either irrelevant or marginally relevant to proof of Defendants' liability.  Moreover, the court finds it unlikely that the jury based its decision regarding emotional damages on anything other than the direct consequences of CSG's actions.  The court finds no reasonable likelihood that the jury would have made a different decision in any respect had they heard more information about Mr. Conti's other business and job ventures.

ORDER – 12

### 3. The Court Finds That the Conduct of Mr. Conti's Counsel Did Not Prejudicially Influence the Jury's Verdict.

As to Mr. Conti's counsel's misconduct, the court will not address it in detail.  The court will discuss counsel's approach to this litigation again when it considers counsel's request for attorney fees.  For now, the court will say only that it places a great deal of trust in the jury's ability to focus on the evidence, as opposed to the conduct of the attorneys, when reaching its verdict.  In this case, there was much in the conduct of both Mr. Conti's lead counsel and Defendants' lead counsel which distracted from, rather than enhanced, the jury's consideration of the evidence.  The court declines to detail that conduct, however, because it is firmly convinced that the jury reached its verdict because of the evidence, not because of any passion or prejudice ignited by any attorney's behavior.  Where Defendants' counsel timely objected to improper conduct, the court generally instructed the jury to ignore it.

Defendants ignore the strongest evidence that the jury was able to disregard any improper conduct: the jury's verdict.  Had the jury uncritically accepted Mr. Conti's lead counsel's mischaracterization of evidence or improper argument, they would not likely have arrived at their nuanced verdict.  The jury concluded (as the court will discuss at length in Part V) that although Defendants discriminated against Mr. Conti, they would have taken the same actions regardless.  The court is convinced that no jury under the sway of Mr. Conti's lead counsel's improper conduct would have reached that verdict.

### 4. Defendants Suffered No Prejudice Because Mr. Conti Was Granted Additional Trial Time.

The court granted Defendants and Mr. Conti an equal allotment of trial time.  Mr. Conti exhausted his allotment near the end of trial, largely because he wasted substantial time prior to that.  Rather than preclude counsel from conducting additional cross-examination, the court granted him (according to Defendants) an additional 125 minutes of trial time.

ORDER – 13

The court has broad discretion to manage trial time.  *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002); *Monotype Corp. v. Int'l Typeface Corp.*, 43 F.3d 443, 450 (9th Cir. 1994).  If Defendants had exhausted their allotment of time, the court likely would have granted them additional time as well.  *See Navellier v. Sletten*, 262 F.3d 923, 942 (9th Cir. 2001) (noting court's authority to adjust time allotments during trial).  But Defendants had ample time remaining when they rested their case, and thus suffered no prejudice as a result of their allotment of time.  *See Monotype*, 43 F.3d at 451 ("A crowded docket does not justify an infringement on the right to reasonably develop a case; however, the objecting party must show there was harm incurred as a result.").  The court does not believe that the jury's verdict would have been different even if it had precluded Mr. Conti's counsel from finishing cross examination.  But even if that were not the case, Defendants cannot claim prejudice because Mr. Conti used more trial time than they did.

### 5.    The Court Finds No Error In Its Failure to Give Any Jury Instruction That Defendants Offered.

Defendants' cursory argument that the jury was not adequately instructed as to an employer's discretion in making personnel decisions is unconvincing.  The court briefly discusses Defendants' proposed instruction on that issue in Part V.  The court finds no error in failing to give that instruction, and no indication that giving the instruction would have made any difference in the verdict.  The court finds Defendants' remaining contentions regarding jury instructions to be unpersuasive.

### 6.    The Jury's Damages Award Was Not Excessive.

The jury's award of $170,000 in emotional distress damages was within the range that the evidence supported.  The court finds no basis for setting aside that award, ordering it reduced, or ordering a new trial because of it.

ORDER – 14

## V.   THE SAME-DECISION DEFENSE

The parties dispute the impact of the jury's conclusions that although both Defendants discriminated against Mr. Conti, Defendants would have made the same decisions about him even if they had not discriminated.  The jury explicitly concluded that Defendants had proven what the court will call the "same-decision defense" to Title VII liability.  The jury's conclusions on the Title VII same-decision defense came in response to two sets of three verdict form questions that were identical except that one set concerned Mr. Leon and one set concerned CSG.  The set directed to CSG was as follows:

QUESTION 1

Did CSG discriminate against Mr. Conti on the basis of race or national origin in violation of Washington law?

QUESTION 2

Did CSG discriminate against Mr. Conti on the basis of race or national origin in violation of federal law?[2]

QUESTION 3

Would CSG have taken the adverse employment action or actions you found to be discriminatory in answering Question 2 even if Mr. Conti's race and national origin had played no role in CSG's decision to take the action or actions?

The jury responded "YES" to all three questions, just as they did in response to the three questions concerning Mr. Leon.

As the questions on the verdict form suggest, the court separately instructed the jury as to discrimination in violation of the WLAD and in violation of Title VII.  The

---

[2] The parties proposed no instructions differentiating Mr. Conti's Title VII claims from his claims invoking 42 U.S.C. § 1981.  The court accordingly treated those claims as identical in its jury instructions, referring to them generically as "federal law."  Dec. 6, 2013 ord. (Dkt. # 168) at 3.  The parties did not object.  For purposes of its discussion of the same-decision defense under federal law, the court relies solely on decisions interpreting Title VII.  No party has suggested that the § 1981 same-decision defense differs, and even if it did, it would make no difference in the court's analysis today.  *See Metoyer v. Chassman*, 504 F.3d 919, 934 (9th Cir. 2007) (holding that § 1981 same-decision defense to discrimination claims is identical to Title VII defense).

ORDER – 15

court's instruction as to Title VII liability adhered closely to Ninth Circuit Model Civil Jury Instruction 10.1C.  It concluded with this paragraph addressing the same-decision defense:

> If you find that Mr. Conti has proved [the elements of discrimination under federal law], you must also decide whether any Defendant has proven that the Defendant would have taken the same adverse employment action or actions even if Mr. Conti's race and national origin had played no role in [the] decision to take the action or actions.

Jury Instruct. No. 17 (Dkt. # 179).  The court's instruction as to WLAD liability contained no similar paragraph.  Jury Instruct. No. 16 (Dkt. # 179).  Like the jury instructions, the verdict form asked the jury about the same-decision defense as to Mr. Conti's Title VII claim, but not his WLAD claim.

The court entered judgment on the jury's verdict.  Before it did, Defendants filed an objection that argued, "for the first time, that the 'same decision' defense that applies in Title VII claims also applies to claims under the [WLAD]."  Dec. 17, 2013 ord. (Dkt. # 191) at 1.  The court declined to address that argument before entering judgment, without prejudice to Defendants raising it in a motion for judgment as a matter of law. *Id.* at 2.

The court now considers whether the WLAD permits a same-decision defense and the effect of Defendants' failure to request jury instructions on that defense.

**A.    The WLAD's Same-Decision Defense Requires the Employer to Meet a Higher Standard of Proof Than the Title VII Same-Decision Defense.**

    **1.    Title VII's Same-Decision Defense**

The same-decision defense in Title VII is statutory.  Subsection 2000e-2(m) of the statute declares that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  Title VII thus explicitly states that a defendant can be liable in a so-called "mixed-motive" case, where a defendant has both discriminatory and legitimate motives

ORDER – 16

for taking an adverse action against an employee.  Subsection 2000e-5(g)(2)(B) codifies the same-decision defense in mixed-motive cases:

> On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—
>
> > (i)    may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and
> >
> > (ii)   shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

Title VII's same-decision defense is thus a partial affirmative defense.  It permits a defendant who proves that it would have taken an adverse action even without an unlawful motive to avoid damages (including backpay), but not to avoid declaratory relief, injunctive relief, or attorney fees.

Title VII did not codify a same-decision defense until Congress amended it in 1991.  The 1991 amendments responded to the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244 (1989), where a majority of the Court agreed that in a case where "both legitimate and illegitimate reasons motivated" an employment decision, an employer could avoid liability *entirely* "by proving that it would have made the same decision even if it had not allowed [discrimination] to play such a role."  *Id.* at 244.  The justices in *Price Waterhouse* divided over what a plaintiff needed to prove to obligate the employer to prove the same-decision defense, disagreeing over whether the plaintiff needed to show that discrimination was a "motivating factor" or a "substantial factor" in the employment decision.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93-94 (2003) (reviewing plurality and concurring opinions from *Price Waterhouse*).  In the 1991 amendments to Title VII, Congress both established that a plaintiff could prove an unlawful practice by showing that discrimination was a "motivating factor" (§ 2000e-

ORDER – 17

2(m)) and that a when a plaintiff succeeds in doing so, the employer's proof that it "would have taken the same action in the absence of the impermissible motivating factor" (§ 2000e-5(g)(2)(B)) provides a "limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff." *Desert Palace*, 439 U.S. at 94. In *Desert Palace*, the Court considered an aspect of the Ninth Circuit's decision in *Costa v. Desert Palace, Inc.*, 299 F.3d 838 (9th Cir. 2002). *Desert Palace*, 439 U.S. at 101 (affirming Ninth Circuit's determination that a plaintiff need not offer direct evidence to prove a violation of § 2000e-2(m)'s "motivating factor" standard).

In *Costa*, the Ninth Circuit held that an employer must prove the same-decision defense by a preponderance of the evidence, reaching the same result as to the amended version of Title VII that the *Price Waterhouse* Court had reached before the 1991 amendments. *Costa*, 299 F.3d at 857; *Price Waterhouse*, 490 U.S. at 253 (Brennan, J., on behalf of four-justice plurality), at 260 (White, J., concurring), at 261 (O'Connor, J., concurring).

In Defendants' post-trial view, the WLAD permits a same-decision defense at least as wide-ranging as the one described in *Costa* – a defense that, when proven by the employer by a preponderance of the evidence, is not a bar to liability, but eliminates any remedies other than "attorney's fees, declaratory relief, and an order prohibiting future discriminatory actions." 299 F.3d at 857. Defendants also suggest that the WLAD's same-decision defense may operate, like the one announced in *Price Waterhouse*, as a "complete defense to liability." Defs.' Mot. (Dkt. # 219) at 4. Mr. Conti argues that there is no same-decision defense to WLAD liability.

## 2.    The WLAD's Same-Decision Defense

So far as the court is aware, only one decision from Washington's state courts squarely addresses a same-decision defense to WLAD liability. In *Davis v. Dep't of Labor & Indus.*, 615 P.2d 1279, 1280 (Wash. 1980), the court considered a bench trial in which the judge found that the employer discriminated against a woman on the basis of

ORDER – 18

her gender in refusing to promote her, but "denied her backpay on the ground that even absent the discrimination she would not have been promoted." The trial court awarded plaintiff her costs and attorney fees. *Id.* at 1281. The *Davis* court acknowledged that federal courts interpreting Title VII had refined a rule that backpay should not be available if the *employer* proved that it would not have selected the employee for promotion even if it had not discriminated. *Id.* at 1282-83. The *Davis* court considered whether the trial court had properly required the employer to prove by "'clear and convincing evidence' that [the employee] would not have been promoted even absent discrimination." *Id.* at 1283. The court affirmed the trial court, "adopt[ing] the clear and convincing standard as the burden of proof to be carried if an employer is to avoid a backpay award." *Id.* at 1284. The court noted (eight years before *Price Waterhouse*) that federal courts had split as to whether clear and convincing evidence, as opposed to a mere preponderance of evidence, was the appropriate quantum of proof. *Id.* at 1283.

The *Davis* court's version of the same-decision defense, which no Washington court has overruled or questioned, remains the law in Washington: to avoid an award of damages (but not attorney fees or costs) an employer who has discriminated in violation of the WLAD must prove by clear and convincing evidence that it would have made the same decision even if it had not discriminated. In some respects, the *Davis* defense resembles the Title VII defense. It is an affirmative defense on which the employer bears the burden of proof, but it is not a complete defense – it merely limits the plaintiff's remedies.[3] The primary difference between the *Davis* defense and the Title VII defense is that a defendant facing WLAD liability must prove the same-decision defense by clear and convincing evidence.

---

[3] Although *Davis* described its same-decision defense as a defense to "damages," 615 P.2d at 1281, the plaintiff requested only back pay, not any other form of damage (like emotional distress). This court does not decide whether an employer's successful invocation of the *Davis* defense prohibits a plaintiff from recovering emotional damages caused by discrimination, as opposed to emotional damages caused by the economic consequences of discrimination.

ORDER – 19

Courts (and Congress) have refined Title VII and the WLAD substantially since the Washington Supreme Court decided *Davis* in 1981.  Nonetheless, no court has ever criticized, much less overruled, *Davis*'s description of the WLAD's same-decision defense, including its "clear and convincing evidence" requirement.  *Saleemi v. Doctor's Assocs.*, 292 P.3d 108, 113 (Wash. 2013) ("[U]ntil our precedents are specifically overruled they remain good law."); *State v. Gore*, 681 P.2d 227, 231 (Wash. 1984) ("[O]nce this court has decided an issue of state law, that interpretation is binding on all lower courts until it is overruled by this court."); *State v. Studd*, 973 P.2d 1049, 1056 (Wash. 1999) ("We will not overrule such binding precedent sub silentio.").  Defendants do not argue to the contrary.  Indeed, they repeatedly cite *Davis*, without admitting that no court has overruled its clear and convincing evidence requirement.  Nonetheless, they insist that federal and Washington authority since *Davis* holds that a defendant need only prove the same-decision defense by a preponderance of the evidence.

### 3.    No Washington Authority Permits the Court to Overlook *Davis*.

Several decisions from Washington's state courts contain statements that, stripped of context, are arguably inconsistent with *Davis*.  For example, the Washington Supreme Court has, in a case that does not cite *Davis*, stated that once a plaintiff proves that "discriminatory animus was a substantial factor in the [employment] decision at issue," the employer must prove "that it would have taken the same action regardless of discriminatory animus."  *Hegwine v. Longview Fibre Co.*, 172 P.3d 688, 698-99 (Wash. 2007).  The *Hegwine* court did not mention the quantum of proof, which Defendants treat as the equivalent of a statement that a preponderance of evidence standard applies.  Defendants do not explain how the court can treat *Hegwine* as silently overruling *Davis*.  In any event, an examination of *Hegwine* and cases like it demonstrates that they do not undermine *Davis*.

The *Hegwine* court reviewed a bench trial resulting in a judgment in favor of an employer accused of discriminating against a woman because she was pregnant.  172

ORDER – 20

P.3d at 692.  The court upset that judgment almost entirely, concluding instead that the plaintiff was entitled to judgment as a matter of law.  *Id.* at 697 (finding sex discrimination as a matter of law); *id.* at 699 (affirming appellate court's conclusion that employer violated WLAD's prohibition on inquiry into job applicant's pregnancy status as a matter of law).  Because it was considering judgment as a matter of law, it considered Washington's standards for judgment as a matter of law in employment cases. It noted that the plaintiff had not attempted to prove discrimination by circumstantial evidence, and thus the burden-shifting regime of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), was not applicable.  *Hegwine*, 172 P.3d at 698.  Because the plaintiff attempted to prove discrimination with direct evidence, the court explained that it was her burden to prove that "discriminatory animus was a substantial factor in the decision at issue," and that the employer then had to prove "that it would have taken the same action regardless of discriminatory animus."  *Id.* at 698-99.  The *Hegwine* court took the latter quote wholesale from *Griffith v. Schnitzer Steel Indus., Inc.*, 115 P.3d 1065, 1069 n.4 (Wash. Ct. App. 2005).

The *Griffith* court's enunciation of the direct evidence standard was dicta contained in the following footnote:

> *In circumstances other than those presented here*, an employee presenting direct evidence of discrimination may proceed under the analysis set forth in *Price Waterhouse v. Hopkins* . . . and *Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 898 P.2d 284 (1995). This analysis requires only that an employee produce direct evidence that discriminatory animus was a substantial factor in the decision at issue, after which the burden of persuasion shifts to the employer, who must prove that it would have taken the same action regardless of discriminatory animus. *Hopkins*, 490 U.S. at 250-53; *Mackay*, 127 Wn.2d at 309-10.

115 P.3d at 1069 n.4 (emphasis added).  By its very terms, the footnote is dicta, for it applies in "circumstances other than those presented" in the case before the *Griffith* court. Even if it were not, the *Griffith* footnote is silent as to the impact of the defendant's proof that it would have taken the same action.  *Griffith* does not suggest, as Defendants

ORDER – 21

contend, that an employer's proof that it would have taken the same action if it had not discriminated means that it can avoid liability or damages.  The footnote's citation to *Mackay* is perplexing, because the cited pages of *Mackay* do not mention an employer's proof that it would have taken the same action absent discrimination.  *Griffith* accurately summarizes the *Price Waterhouse* version of the same-decision defense, but does not suggest that the *Price Waterhouse* defense had supplanted the *Davis* defense in Washington.

Binding authority demonstrates that the dicta in *Griffith* does not undermine the *Davis* same-decision defense.  Rather than citing dicta in *Griffith*, the *Hegwine* court could have turned to Washington Supreme Court precedent as to the burdens applicable in deciding whether to grant judgment as a matter of law in a direct evidence case.  For example, in *Kastanis v. Educ. Employees Credit Union*, 859 P.2d 26 (Wash. 1993), the court described the difference between cases involving direct and circumstantial evidence of discrimination.  Like the *Griffith* court, the *Kastanis* court explained that a plaintiff could offer direct evidence of a discriminatory motive and that the discriminatory motive was a substantial factor in the adverse employment decision.  *Kastanis*, 859 P.3d at 30.  Like the *Griffith* court, the *Kastanis* court explained that once the plaintiff provided that evidence, "the defendant must show, by a preponderance of the evidence, that the same decision would have been reached absent the discriminatory factor."  *Id.*  The critical difference between *Kastanis* and the dicta in *Griffith* is that the *Kastanis* court explained the impact of the defendant providing evidence that it would have made the same decision: "In the face of such evidence, the case goes to the jury."  *Id.* at 31.  Neither *Griffith* nor *Kastanis* was addressing a same-decision defense applicable at trial, both were addressing what evidence would suffice to demonstrate triable issues preventing judgment as a matter of law.  The federal case that the *Kastanis* court cited confirms as much.  *Buckley v. Hosp. Corp.*, 758 F.2d 1525, 1530 (11th Cir. 1985) ("[D]efendant's evidence merely creates a jury question as to whether defendants have proved by a

ORDER – 22

preponderance of the evidence that the decision would have been reached even in the absence of age discrimination.") (cited in *Kastanis*, 859 P.2d at 30-31).

Courts discussing circumstantial cases of discrimination have also made statements that, stripped of context, suggest a version of the same-decision defense that differs from the one announced in *Davis*.  For example, the court in *Becker v. Wash. State Univ.*, 266 P.3d 893, 902 (Wash. Ct. App. 2011) stated that an employer moving for summary judgment on a WLAD claim could rebut a prima facie circumstantial case of discrimination by "show[ing] a legitimate, nondiscriminatory reason for its conduct." 266 P.3d at 902.  If the employer succeeds, a plaintiff can avoid summary judgment by showing that the proffered reason was mere pretext.  *Id.*  The court also stated, however, that the court could grant summary judgment "when the record conclusively revealed some other nondiscriminatory reason for the employer's decision . . . ."  *Id.* at 903 (internal quotation omitted).  To the extent that *Becker* holds that a mere nondiscriminatory reason, rather than a nondiscriminatory reason that would have led the employer to take an adverse action in the absence of discrimination, is a sufficient basis to avoid liability under the WLAD, it is not consistent with *Davis*, and this court cannot follow it.[4]  *Keller v. Elec. Arts Inc.*, 724 F.3d 1268, 1278 ("[W]e are bound only by the decisions of a state's highest court and not by decisions of the state's intermediate appellate court when considering state-law issues sitting in diversity jurisdiction.").  But the court doubts that *Becker* is inconsistent with *Davis*.  When the record "conclusively reveal[s]" that the employer had a nondiscriminatory reason for its decision, it no doubt establishes by clear and convincing evidence that the employer would have made the same decision absent a discriminatory motive.  The *Becker* court had no occasion to

---

[4] *Becker*'s take on the same-decision defense quoted *Milligan v. Thompson*, 42 P.3d 418, 423 (Wash. Ct. App. 2002), which in turn quoted *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).  This court's analysis of *Becker* is equally applicable to *Milligan*.  *Reeves*, which addressed the federal Age Discrimination in Employment Act, applies to the WLAD only to the extent that Washington's courts have decided it does.  No Washington court has held or suggested that *Reeves* governs the WLAD same-decision defense, which would require a court to overrule *Davis*.

ORDER – 23

consider the effect of the same-decision defense on the plaintiff's remedies, because it ruled that the plaintiff's age discrimination claim was impermissible as a matter of law because the plaintiff was a student, rather than an employee. *Id.* at 903.

### 4.       No Federal Authority Permits the Court to Overlook *Davis*.

Only one federal district court decision of which this court is aware addresses both *Davis* and the WLAD's same-decision defense.  In that decision, the court recognized the different standards of proof applicable to each defense.  *Chen v. City of Medina*, No. C11-2179TSZ, 2013 U.S. Dist. LEXIS 120437, at *20 (W.D. Wash. Aug. 23, 2013) ("[D]efendants were required to demonstrate, by clear and convincing evidence as to the state law claim and a preponderance of the evidence as to the federal law claims, that their employment decisions would have been the same if premised solely on one or more legitimate, non-discriminatory reasons.").  Defendants cite *Chen*, but do not acknowledge that it applied the *Davis* defense as to the WLAD claims and the Title VII defense as to the federal law claims.

Several district court decisions contain statements suggesting a WLAD same-decision defense that is not consistent with *Davis*.  *E.g.*, *Campbell v. Catholic Cmty. Servs.*, No. 10-1579RAJ, 2012 U.S. Dist. LEXIS 22616, at *6 ("[A]n employer may overcome . . . a WLAD claim by demonstrating that it would have taken the same action without regard to the employee's protected status.") (internal quotation omitted); *Zahn v. Harvey*, No. CV-03-356EFS, 2008 U.S. Dist. LEXIS 105472, *8-10 (E.D. Wash. Dec. 31, 2008) (stating that the "Title VIII retaliation analytical framework is also used for . . . the WLAD," concluding that defendant had proven that adverse action would have occurred "notwithstanding [plaintiff's] workplace grievances"); *Liggett v. Wash. State Univ.*, No. C13-5176RJB, 2014 U.S. Dist. LEXIS 25418, at *26 (W.D. Wash. Feb. 26, 2014) ("When a plaintiff relies on direct evidence of discrimination to prove a WLAD claim, he or she need only prove that discriminatory animus was a substantial factor in the decision at issue, after which the burden of persuasion shifts to the employer, who

ORDER – 24

must prove that it would have taken the same action regardless of discriminatory animus."). None of these decisions address *Davis*. None of these decisions suggest that the parties disputed whether the WLAD's same-decision defense differed from the Title VII defense. Moreover, two of the decisions rely on the Washington authority that the court has just distinguished. In *Campbell*, the court relied on the language from *Becker*. 2012 U.S. Dist. LEXIS 22616 at *6-7. The *Liggett* court cited the footnote in *Griffith*. 2014 U.S. Dist. LEXIS 25418 at *26.

In *Zahn*, the court ruled in the employer's favor on plaintiff's Title VII claim after concluding both that the plaintiff failed to prove "that his workplace grievances played a part in the decision" to take the adverse action at issue, and that the "evidence established that the [employer] would have [taken the same action] notwithstanding his workplace grievances." 2008 U.S. Dist. LEXIS 105472, at *8-9. Without suggesting any dispute over the differences between the WLAD and Title VII with respect to the same-decision defense, the court stated that "the Title VII retaliation analytical framework is also used for . . . the WLAD." *Id.* at *10. It cited *Stegall v. Citadel Broad Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003). *Stegall* did not consider *Davis* or whether the WLAD and Title VII same-decision defenses are identical. *Id.* at 1067-68 (citing *Costa* and other authority addressing the same-decision defense under federal law).

The court doubts that its colleagues in *Liggett*, *Campbell*, and *Zahn* intended to suggest a WLAD same-decision defense less demanding of employers than the one from *Davis*. There is no indication, for example, that any of those cases turned on the employer's invocation of that defense. Nonetheless, to the extent that these cases (or any other federal authority) suggest a same-decision defense inconsistent with the *Davis* defense, the court declines to follow them.[5]

---

[5] Defendants cited an unpublished opinion from 2000 in which a Ninth Circuit panel concluded that the WLAD permits a same-decision defense that, like the defense from *Price Waterhouse*, is a complete defense to liability. The Ninth Circuit's rules prohibit Defendants from citing that opinion, and this court will not cite it. 9th Cir. Rule 36-3 (prohibiting, except in circumstances

ORDER – 25

**B.    Although the Court Doubts Mr. Conti's Contention that the WLAD Permits No Same-Decision Defense, It Need Not Decide the Issue.**

Mr. Conti is unwilling to accept even the *Davis* version of the same-decision defense; he contends that there is no same-decision defense to a WLAD claim.  His argument depends on the decisions in *Allison v. Housing Authority*, 821 P.3d 34 (Wash. 1991), and *Mackay*.  *Allison* held that a plaintiff invoking the anti-retaliation provision of the WLAD (RCW 49.60.210) "must prove causation by showing that retaliation was a substantial factor motivating the adverse employment action."  *Mackay* extended the *Allison* holding to cases invoking the status-based discrimination provision of the WLAD (RCW 49.60.180).  *Mackay*, 821 P.3d at 288 ("[W]e hold that in order to prevail . . . a plaintiff must prove that an attribute listed in RCW 49.60.180(2) was a 'substantial factor' in an employer's adverse employment decision.").

Neither the *Allison* nor the *Mackay* court made an explicit ruling as to the same-decision defense.  Both courts were aware of the defense.  The *Allison* court distinguished *Davis* by noting that *Davis* reviewed an unchallenged finding of discrimination, after which it was the employer's burden to establish the same-decision defense.  821 P.2d at 41 (discussing *Davis*, noting that "[i]n the instant case there is no comparable evidence that would make discrimination or retaliation an established fact and justify shifting the burden to the employer").  The *Allison* court also discussed *Price Waterhouse* and its "same decision" defense, but did not adopt it.  821 P.2d at 40 ("Because federal case law is not unequivocal, and is only persuasive authority, we adopt a standard that best corresponds with the language and policies contained in this State's antidiscrimination law.").  The majority opinion in *Mackay* is less expansive than in *Allison*, perhaps in part because *Allison* had already built the framework for *Mackay*'s holding.  The *Mackay* majority discussed neither *Price Waterhouse* nor the same-decision defense.

---

not applicable here, the citation of unpublished Ninth Circuit dispositions issued prior to 2007). The court observes that the unpublished opinion did not mention *Davis*.

ORDER – 26

The *Mackay* dissent, however, viewed the majority opinion as embracing the notion that "damages could be awarded for loss of employment even if the loss of employment would have occurred regardless of the unlawful determination."  898 P.2d at 284, 290 (Madsen, J., dissenting).  After reviewing the Title VII same-decision defense in the wake of *Price Waterhouse* and the 1991 amendments, the dissent crystallized the "striking contrast" between the majority's view of the WLAD and Title VII:

> Neither the majority's opinion nor our State statute has any similar limiting effect under the majority's "substantial factor" standard.  Thus, the majority's adoption of a "substantial factor" test results in a vastly different result than such a test under federal law, and can lead to the curious result that damages may be awarded for loss of employment which would have occurred regardless of the employer's illegal discrimination.

*Id.* at 291.  In the view of the dissenting justice in *Mackay*, Washington law in the wake of the *Mackay* majority opinion did not permit a same-decision defense.

Neither *Mackay* nor *Allison* explicitly overrules *Davis*, and the court is reluctant to conclude that they did so implicitly, even in light of the *Mackay* dissent and the *Allison* court's discussion of the federal same-decision defense without adopting it.  A dissenting opinion's characterization of the majority opinion is not binding.  Moreover, both *Allison* and *Mackay* were concerned with ensuring that a *plaintiff* was not saddled with the difficult task of proving that an employer's legitimate motivations for an adverse employment decision would have sufficed in the absence of a discriminatory motive.  *Allison*, 821 P.2d at 38 (declining to impose "unrealistic burden on an employee to show precisely which factors – legitimate or illegitimate ones – actually motivated an employer").  The *Mackay* court discussed the *Allison* court's concern that if "the 'determining factor' standard were adopted in a retaliation case, the employee would have to prove that his or her employer would not have engaged in the allegedly retaliatory action but for the employee's assertion of his or her statutory rights," then observed that "[s]uch a high burden of proof is very difficult for an employee to meet."  898 P.2d at 287.  It then adopted the *Allison* court's observation that the "reasoning for

ORDER – 27

ameliorating the harshness of a 'but for' standard of causation applies equally to situations involving discriminatory or retaliatory discharge, because legitimate and illegitimate motives often lurk behind those decisions." *Mackay*, 898 P.2d at 288 (quoting *Allison*, 821 P.2d at 42). Neither *Mackay* nor *Allison* rules out a partial affirmative defense requiring an *employer* to prove that it would have made the same decision absent unlawful motives.

Were the court forced to decide the issue, it would rule that neither *Mackay* nor *Allison* reject the same-decision defense from *Davis*. The court can leave that question to a Washington court, however, because it will not impact any party in this case. The court rules that if there is a WLAD same-decision defense, it is the one that the *Davis* court announced. As the court will now discuss, Defendants waived the *Davis* defense by failing to request a jury instruction on it.

## C.   Defendants Waived Application of the WLAD Same-Decision Defense.

Defendants ask the court to relieve them of the jury's damage award by concluding that the jury's factual finding that they would have made the same decisions about Mr. Conti even if they had not discriminated against him is a bar to damages via the WLAD. The court cannot do so, because the court asked the jury only to decide whether Defendants had proven the same-decision defense by a preponderance of the evidence,[6] in accordance with federal law. There is no way to know what the jury would have decided if it had been asked to decide if Defendants had proven the defense by clear and convincing evidence, as *Davis* requires.

---

[6] The instruction containing the same-decision defense asked the jury to decide "whether any Defendant has proven that the Defendant would have taken the same adverse employment action or actions even if Mr. Conti's race and national origin had played no role in the decision to take the action or actions." Jury Instruct. No. 17 (Dkt. # 179). It did not mention a quantum of proof. An earlier instruction informed the jury that the quantum of proof applicable to every issue on which a party bore the burden of proof was "a preponderance of the evidence." Jury Instruct. No. 10 (Dkt. # 179). Because no party raised any claim or issue requiring clear and convincing evidence, the court did not instruct the jury as to the meaning of that quantum of proof.

ORDER – 28

### 1. Defendants Did Not Request a Jury Instruction on a WLAD Same-Decision Defense.

Defendants' failure to request a jury instruction on a WLAD same-decision defense is fatal to their attempt to invoke it now. Rule 51 of the Federal Rules of Civil Procedure requires a party both timely to request jury instructions and timely to object to any instruction it believes is improper. Fed. R. Civ. P. 51(a), (c). Failure to object waives review of any error except a plain error affecting substantial rights. Fed. R. Civ. P. 51(d); *Hunter v. County of Sacramento*, 652 F.3d 1225, 1230 & n.5 (9th Cir. 2011). There is no question that Defendants did not request instructions on the *Davis* defense or object to the court's failure to do so. Defendants neither cited *Davis* before their post-trial motions nor requested that the jury be instructed as to the defense that *Davis* describes. *See Hunter*, 652 F.3d at 1230 ("[A] party may properly object by submitting a proposed instruction that is supported by relevant authority, so long as the proffered language is sufficiently specific to bring into focus the precise nature of the alleged error.") (internal quotations and alterations omitted).

There is no support in the record for Defendants' contention that they at least objected to the court's failure to give an instruction embodying some version of the WLAD same-decision defense, even if it was not the *Davis* defense. To begin, the court questions whether it would matter if Defendants had requested such a defense, because the court is aware of no authority that a party can overcome its failure to request a proper instruction by requesting an improper one on the same subject. Putting that aside, Defendants did not request an instruction on *any* version of a WLAD same-decision defense. The parties proposed jury instructions before trial. Dkt. ## 136, 149. They contained no suggestion of a same-decision defense applicable to the WLAD. At the conclusion of the Friday following the first four days of trial, the court issued an order attaching its proposed jury instructions. Dec. 6, 2013 ord. (Dkt. # 168). Instruction No. 16 covered the elements of discrimination in violation of the WLAD, Instruction No. 17 covered the elements of discrimination in violation of federal law, and concluded with a

ORDER – 29

paragraph on the same-decision defense.  *Id*.  That paragraph was substantially identical to the paragraph that concludes Ninth Circuit Model Civil Jury Instruction 10.1C.

At the jury instruction conference on the following Tuesday (after the close of evidence), Defendants' sole objection to Instruction No. 16 was that it did not expressly state that Mr. Conti needed to prove his WLAD claim by a preponderance of the evidence.  Dec. 10, 2013 Transcript ("Tr.") (Dkt. # 206) at 213-14.  Mr. Conti objected that even though Instruction No. 17 followed the model instruction, the model instruction was wrong in that it implied that proof of the same decision defense was a *complete* defense to federal liability, as opposed to the partial defense embodied in Title VII.  *Id.* at 202-05.  In response, Defendants requested that the court adhere to the model instruction, but still made no mention of a same-decision defense for WLAD claims.  *Id.* at 220-21.  That night, the court's staff emailed the parties a "final" version of the jury instructions, informing them that they would have one final opportunity to make formal exceptions before the court instructed the jury the following day.  *See* Dec. 11, 2013 Tr. (Dkt. # 207) at 2.  As was the case in the draft instructions, Instruction No. 16 covered WLAD discrimination and Instruction No. 17 covered discrimination in violation of federal law.  Dkt. # 179.  The final version of Instruction No. 16 contained slight modifications unrelated to the same-decision defense, whereas the final version of Instruction No. 17 modified the paragraph describing the same-decision defense to eliminate the suggestion that it was a complete defense to liability.  *Id.*  Defendants' only objections to those instructions were the "same objection[s] we made yesterday."  Dec. 11, 2013 Tr. (Dkt. # 207) at 5.  No one objected to the verdict form.

Unable to cite any portion of the record in which they addressed any version of a same-decision defense applicable to the WLAD, Defendants ask the court to conclude that their requests for unrelated instructions somehow covered the same-decision defense. For example, they contend that their requests for instructions addressing an employer's discretion to make employment decisions for any non-discriminatory reason somehow

ORDER – 30

encapsulated a same-decision defense. *E.g.*, Leon Decl. (Dkt. # 220), Exs. D, E, Dec. 10, 2013 Tr. (Dkt. # 206) at 222. Those instructions do not suggest any affirmative defense, much less the same-decision defense. They do not address an employer's ability to escape liability (in whole or in part) when a jury finds it has discriminated, they merely emphasize an employer's right not to discriminate. For the same reasons, the court finds no merit in Defendants' contention that their requests for instructions about their claim to have "legitimate business reasons" for the decisions they made about Mr. Conti somehow encapsulated a same-decision defense. Leon Decl. (Dkt. # 220), Ex. F; Dec. 11, 2013 Tr. (Dkt. # 207) at 3-4.

> ## 2. The Court's Failure to Instruct the Jury as to a WLAD Same-Decision Defense is Not Plain Error.

Rule 51(d)(2) holds open the possibility of plain error review for erroneous jury instructions that passed without objection. That is an exacting standard, which requires an error that is plain or obvious, that was prejudicial or infringed on substantial rights, and that must be reviewed to prevent a miscarriage of justice. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) ("Plain error is a rare species in civil litigation, encompassing only those errors that reach the pinnacle of fault envisioned by th[is] standard."). First, the court doubts that it can ever be error to fail to instruct a jury as to an affirmative defense that a defendant did not request. Because no defendant is obligated to pursue an affirmative defense, a court need not instruct a jury on an affirmative defense merely because the evidence might support it. Indeed, to instruct a jury on an affirmative defense that a defendant has not invoked would likely be an error that prejudices the plaintiff. Second, even assuming that it was error, it was not plain. No party raised the possibility of a WLAD same-decision defense, a defense that is not in any Washington model jury instruction. Third, even if there was plain error, the court doubts that it prejudiced Defendants, because the court doubts that Defendants could have risen above the clear and convincing evidence barrier that *Davis* erects. And finally,

ORDER – 31

the court finds no miscarriage of justice in awarding civil damages against Defendants who were found to have discriminated, even if the law permitted an additional partial affirmative defense that they did not raise.

**D.   Defendants Cannot Resurrect Their Waived Same-Decision Defense By Recasting It as a Question of Causation.**

Defendants contend that the jury's finding that they would have made the same decisions absent their discriminatory motives means, as a matter of law, that they did not cause Mr. Conti's damages.  They argue that his economic damages arose not from the fact of discrimination, but from the employment consequences that he would have suffered regardless of discrimination.  They argue that the evidence presented at trial demonstrated that his emotional damages arose not from the fact of discrimination, but from his distress over being unemployed.  The latter assertion cannot stand because it is merely an effort to recast the jury's findings in a way that favors Defendants.  The jury's verdict does not permit anyone to determine the jury's views on which actions caused Mr. Conti's emotional harm.  There was testimony from Mr. Conti that he suffered emotional harm immediately upon being informed of Defendants' decision to transfer him and cut his pay, and that he suffered that harm in part because he believed he was the victim of discrimination.  The jury could have awarded emotional damages on that basis alone.

As to the contention that Mr. Conti's economic damages resulted from employment decisions that Defendants would have made even if they had not discriminated, Defendants mischaracterize the law.  Washington's choice to adopt the "substantial factor" test for determining a violation of the WLAD means that an employer violates the law if it fails that test, even if it would have made the same decision absent discrimination.  That is explicitly a "standard[] of causation" that replaces the "but for" standard of causation that normally applies.  *Allison*, 821 P.2d at 42.  Thus, damages flowing from an action that was discriminatory but would have happened even without a

ORDER – 32

discriminatory motive are damages within the scope of this modified standard of causation. Washington is free, of course, to limit the damages recoverable when an employer proves that it would have made the same decision absent discrimination. That is, however, the province of the same-decision defense, a defense whose application Defendants have waived.

**E.    If the Court is Mistaken, and the WLAD Same-Decision Defense is the Same as the Title VII Defense, Then Defendants Are Entitled to Judgment as a Matter of Law Setting Aside the Jury's Damage Award.**

The court makes one final ruling as to the same-decision defense, a ruling that would apply only if a reviewing court reverses this court's previous rulings on that subject.

Mr. Conti contends that even if Defendants are correct and the WLAD permits a same-decision defense equivalent to the Title VII defense or the *Price Waterhouse* defense, the court still must uphold the jury's verdict. He characterizes the jury's verdict as a "general verdict," and notes that the court cannot disturb general verdicts permitted by the jury instructions even if they appear inconsistent. In *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1034 (9th Cir. 2003), the court applied that principle and declined to upset a jury's conclusion that a defendant had discriminated in violation of 42 U.S.C. § 1981, but not in violation of the WLAD.

Here, however, Defendants focus not on the jury's general verdicts against them, but the special verdict as to the same-decision issue. That was a "special verdict" because it was a factual determination (would Mr. Leon or CSG have taken the adverse employment actions against Mr. Conti even if he or it had not discriminated) that left the court to decide its legal consequences. *See Zhang*, 339 F.3d at 1031 (distinguishing general and special verdicts). In Defendants' view, that factual finding is irreconcilable with the jury's award of damages.

Mr. Conti argues that there is no irreconcilability, because it is possible that the jury found that one set of Defendants' actions violated the WLAD, and a different set of

ORDER – 33

actions violated federal law.  Because of that possibility, it is possible that the jury's same-decision finding as to federal law would not apply to the actions that violated the WLAD.  Mr. Conti does not argue that it is likely that the jury reached these findings, nor could he.  No party attempted to highlight to the jury any relevant difference between Title VII and the WLAD, and no party attempted to argue to the jury that an action could violate one statute but not the other.  The court concludes that it is not a reasonable possibility that the jury based its federal law and WLAD verdicts on two mutually exclusive sets of actions.  Because it was not a reasonable possibility, it did not obligate Defendants to make an objection after the jury returned its verdict, but before the court discharged the jury.  *See Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010).  For these reasons, if a reviewing court were to determine that the WLAD's same decision-defense is the same as the Title VII defense, the court would enter judgment as a matter of law that Defendants are not liable to Mr. Conti for his economic damages or his emotional distress.

## VI.   JOINT AND SEVERAL LIABILITY

In his motion for relief from judgment invoking Federal Rule of Civil Procedure 60(b), Mr. Conti asks the court to amend the judgment to indicate that Mr. Leon is jointly and severally liable for *all* of the damages the jury awarded.  He makes the request even though the jury found that Defendants collectively had caused Mr. Conti about $20,000 in economic damages and about $170,000 in emotional harm, whereas Mr. Leon alone had caused no economic damages and just $10,000 of emotional harm.  The jury made that finding in answering verdict form questions to which Mr. Conti did not object.

Just after the jury announced its verdict, the court issued an order informing the parties that it intended to enter judgment "against [CSG] for the sum of $190,785.12, and to indicate that Defendant Jay Leon is jointly and severally liable for $10,000 of that amount."  Dec. 12, 2013 ord. at 1.  It ordered the parties to state "any objection to this form of judgment" within four days.  Mr. Conti did not object.  He now asks the court to

ORDER – 34

ignore his failure to object as well as his failure to raise any issue as to joint and several liability until he filed his opposition to a motion in which Mr. Leon proposed to stay enforcement of the judgment against him by obtaining a bond for $12,500.  He filed that opposition more than a month after the jury's verdict.  Ultimately, the court need not decide whether Mr. Conti's failure to state sooner his position as to joint and several liability or his failure to object to the court's proposal to enter judgment operates as a waiver or otherwise bars relief.  Neither the WLAD nor the jury's verdict in this case permits the court to make Mr. Leon responsible for all of the damages awarded against CSG.

The issue before the court is not whether individual defendants and employers can be jointly and severally liable for WLAD damages.  The court has already entered a judgment holding CSG and Mr. Leon jointly and severally liable for the $10,000 in damages that the jury attributed to Mr. Leon.  The question is whether, in a case where the finder of fact has concluded that an individual has caused just a portion of a plaintiff's damages, that individual can be made jointly and severally liable for all of the damages attributed to the employer.

Mr. Conti answers a different question, one that is not relevant in this case, by citing a Washington statute providing that "if more than one person is liable to a claimant on an indivisible claim for the same injury, death or harm, the liability of such persons shall be joint and several."  RCW 4.22.030.  He likens WLAD liability to liability for intentional torts, liability that Washington courts do not apportion among intentional tortfeasors.  *See, e.g.*, *Standing Rock Homeowners v. Misich*, 23 P.3d 520, (Wash. Ct. App. 2001) ("RCW 4.22.030 joint and several liability principles still apply to intentional torts.").  But these principles do not apply here, where there is no "indivisible claim for the same injury . . . or harm" on which to apportion liability.  As Mr. Conti was quick to point out in his effort to distinguish the jury's finding of WLAD liability from its finding of Title VII liability (*see* Part V.E), he presented evidence of multiple adverse

ORDER – 35

employment actions, and neither party asked to have the jury separately decide who (if anyone) was liable for each of those actions or to apportion damages among those actions.  The evidence presented at trial showed that Mr. Leon's involvement came after Mr. Conti had already suffered many of his injuries.  If Mr. Conti wished to determine whether the jury found Mr. Leon causally responsible for the same damages the jury attributed to CSG, he ought to have proposed a verdict form that permitted him to do so.  He did not, and the jury's answers to the verdict form that Mr. Conti accepted suggest that the jury attributed much of Mr. Conti's damage to people other than Mr. Leon.[7]

Absent any basis to conclude, as a matter of law, that the jury found CSG and Mr. Leon liable for the same "indivisible injury," Mr. Conti is left to rely on the unsupported proposition that individuals and employers should always be jointly and severally liable for WLAD damages, regardless of whether they are responsible for the same injuries. That is not the law.  The court has already addressed the circumstances in which the WLAD holds an individual liable for discrimination.  When it permitted Mr. Conti to amend his complaint to state claims against Mr. Leon, Mr. Anderson, and Ms. Gardner, it cited *Brown v. Scott Paper Worldwide Co.*, 20 P.3d 921, 928 (Wash. 2001), in which the court held that "individual employers, along with their supervisors, may be held liable for their discriminatory acts."  *See also* May 24, 2013 ord. (Dkt. # 82) at 3.  The *Brown* court envisioned that whereas employers were vicariously liable for the acts of their employees, supervisors faced liability only for their own wrongdoing:

---

[7] Where the harm that an individual causes is coextensive with the harm attributed to the employer, the individual and the employer jointly and are jointly and severally liable for the entirety of damages in WLAD cases.  For example, in *Arthur v. Whitman County*, No. CV-12-365-LRS, 2014 U.S. Dist. LEXIS 77685, at *30 & n.9 (E.D. Wash. Jun. 5, 2014), the court explained that a supervisor could "personally be jointly and severally liable along with [his employer] for a plaintiff's WLAD damages" in a case where "[t]here [was] no basis for separate compensatory damages awards against [the employer and supervisor]."  That was so because as a matter of fact, the supervisor himself was the perpetrator of the hostile work environment underlying the suit.  *Id.* at *28.  Mr. Conti did not propose a verdict form that permits the court to make that determination in this case, and the jury's verdict strongly suggests that they found much of Mr. Conti's damages attributable to the acts of people other than Mr. Leon.

ORDER – 36

> Employer liability is not based upon independent fault, but upon the theory of respondeat superior.  Under this theory, we hold employers liable for social and economic policy reasons such as the employer's authority over the employee and the employer's deep pocket, not because they are directly at fault. . . .  The theory of respondeat superior does not take into consideration the fault of the employer.  Yet, it does not have the effect of eradicating all fault.  Fault still exists on the part of the actual wrongdoer.  While the employer is liable for social and economic reasons, the supervisor remains liable for his or her own wrongful acts.  Supervisors are liable when they affirmatively engage in discriminatory conduct. . . .  The employer, on the other hand, is liable when any of its employees, who are acting directly or indirectly in its interest, engage in discrimination. . . . .  This is a policy choice embodied in chapter 49.60 RCW.

*Brown*, 20 P.3d at 927 n.3 (citations omitted).  Although *Brown* did not address whether employers and supervisors are jointly and severally liable, to impose joint and several liability is plainly inconsistent with *Brown*.  It would be senseless to declare that an individual is liable "for his or her own wrongful acts" but not for the actions of other employees, only to make the individual liable for the acts of *all* other employees by making the individual jointly and severally liable with the employer.

Finally, the court rejects Mr. Conti's suggestion that because Mr. Leon was the CEO of CSG, he and CSG are one and the same.  The law does not make corporate officers, even CEOs, jointly liable for the harms attributed to the corporation.

For these reasons, the court declines to disturb the judgment declaring that Mr. Leon is jointly and severally liable with CSG only for the $10,000 in damages that the jury attributed to him.

## VII.  ATTORNEY FEES & COSTS

Mr. Conti's counsel represented him on a contingent-fee basis.  Although Mr. Conti's limited success on his federal claims would entitle him to attorney fees and costs, he focuses solely on his WLAD claims and applicable Washington law regarding attorney fees.  Defendants do not object, and the court follows his lead.  Where the court exercises jurisdiction over state law claims, it generally relies on state law regarding the recovery of attorney fees.  *MRO Communications, Inc. v. AT&T Co.*, 197 F.3d 1276,

ORDER – 37

1281 (9th Cir. 1999). The WLAD provides for an award of "the cost of suit including reasonable attorneys' fees" to the prevailing party. RCW 49.60.030(2). In Washington, courts use the lodestar method to determine a reasonable attorney fee award. *Mahler v. Sauces*, 957 P.2d 632, 650-51 (Wash. 1998). The court must determine a lodestar by multiplying a reasonable hourly rate or rates by the number of hours reasonably expended in the litigation. *Id.* at 651. The party seeking fees bears the burden of proof. *Id.*

Proof of an appropriate lodestar begins with reasonable documentation of the work the attorney performed. That documentation "need not be exhaustive or in minute detail, but must inform the court, in addition to the number of hours worked, of the type of work performed and the category of attorney who performed the work (i.e. senior partner, associate, etc.)." *Bowers v. Transamerica Title Ins. Co.*, 675 P.2d 193, 203 (Wash. 1983). In determining if the attorney "reasonably expended" the hours she claims, the court should "discount hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time." *Id.* Determining a reasonable hourly rate requires the court to consider the attorney's usual fee, the attorney's level of skill and experience, the amount of the recovery, and the "undesirability of the case." *Id.* at 203-04. The court can also consider the customary hourly rates in the local area, the effect of the case on the attorney's availability for other work, whether the case is particularly complex or difficult, and a host of other factors. *Mahler*, 957 P.2d at 651 n.20. In an appropriate case, the court can grant an upward or downward adjustment to the lodestar amount to account for factors that are not part of the calculation of reasonable rates or hours expended. *Bowers*, 675 P.3d at 204. Those factors include exceptionally risky litigation or exceptional performance. *Id.*

Mr. Conti requests a lodestar amount of about $950,000, based on more than 3,300 hours of attorney, paralegal, and other staff time at rates ranging from $100 per hour to $500 per hour. He also requests that the court apply a multiplier of 1.5 to the lodestar, for a total award of more than $1.4 million. He claims litigation costs of just under $35,000.

ORDER – 38

He also requests prejudgment interest on his economic damages award. The court now considers each of his requests. In doing so, the court will refer to Mr. Conti's legal team collectively as "counsel" and endeavor to be clear when it is referring to one or more individuals from that team. The court will use only rough numbers in calculating its fee award, acknowledging that arriving at a reasonable fee request in a case like this one is an inherently imprecise task. *See Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992) ("[W]hen faced with a massive fee application the district court has authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of trimming fat from a fee application."). The court's obligation is to explain its reasons for selecting a particular percentage and to independently review the fee request. *Id.* at 1400.

## A. The Court Will Accept Counsel's Claimed Hourly Rates.

The court begins with the 70 pages of time records that counsel submitted. They identify ten people who performed work on Mr. Conti's case: three attorneys, four paralegals, two "staff members," and a person who is identified only by his name. Collectively, these people spent more than 3,300 hours on Mr. Conti's case. Mr. Conti's lead counsel claims to have removed $20,000 worth of "duplicative work" from the billing records, although there is no indication of what he removed. Lead counsel also proposes a $25,000 reduction for work spent on a single unsuccessful motion and having extra staffing during trial.

The lion's share of the time for which Mr. Conti requests compensation was for the work of two attorneys: lead counsel billing at $500 per hour and another attorney billing at $300 per hour. They claim 680 and 1270 hours, respectively, or nearly 60% of all the time for which Mr. Conti seeks compensation. Another attorney claimed about 200 hours at an hourly rate of $310. Two paralegals claimed 520 and 350 hours at rates between $175 and $200. No other person claims to have expended more than 150 hours.

ORDER – 39

With the exception of the $500 hourly rate for lead counsel, the court finds all of the hourly rates that counsel claimed to be reasonable.  In reaching that determination, the court relies primarily on its familiarity with legal fees in the Western District of Washington.  *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (noting that court may rely on its own knowledge and experience regarding fees charged in the area in which it presides).  The parties presented much evidence as to the reasonableness or unreasonableness of those rates, but much of it was self-serving and minimally probative. The court questions whether $500 is a reasonable hourly rate for Mr. Conti's lead counsel, but ultimately will not amend that rate.  The rate is at least near the upper end of the range of rates that experienced employment counsel charge in this District.  The court finds that the reductions it makes to counsel's fee request (as described below) are adequate to compensate for any excess in lead counsel's hourly rate.  Indeed, one of those discounts reflect the court's expectation that an attorney claiming such a high hourly rate would have litigated this case much more efficiently.

**B.    Some of the Work that People Other than Attorneys Performed for Mr. Conti is Not Compensable.**

The court must pare the ten-person roster of people claiming to have performed compensable work on Mr. Conti's behalf.  The court will award no fees for two people who counsel identifies as "staff members."  There is no evidence that they were trained to work as paralegals, that they otherwise performed work that is compensable, or that it would be reasonable or customary to bill clients for their services.  That reduces Mr. Conti's request by $15,000.  The court also eliminates a request for $4,000 for the services of a person named Greg Roth, because there is no evidence identifying him or explaining his role on counsel's team.

With seven timekeepers (three attorneys and four paralegals) remaining, the court considers the extent to which the paralegals performed compensable work.  A court can award fees where a paralegal performs legal (as opposed to clerical) work, does so under

ORDER – 40

the supervision of an attorney, and is qualified "to perform substantive legal work." *Absher Constr. Co. v. Kent Sch. Dist.*, 917 P.2d 1086, 1088 (Wash. Ct. App. 1995). Paralegals (and attorneys) are not entitled to compensation for nonlegal work. *See id.* at 1089 (denying compensation for time spent preparing pleadings, preparing copies, and similar tasks; granting compensation for "time spent preparing the briefs and related work"). Many of the time entries for Mr. Conti's paralegals are either explicitly for clerical work or give the court no basis to determine that the paralegal in question performed legal work. To select a few examples, the paralegals seek compensation for tasks like "burn CDs for upcoming document inspection," "assemble exhibits," "organize and file documents," "travel to opposing counsel's office," "letter to Derek Anderson enclosing witness fee check," "work on making DVDs," "organize discovery documents," and "delivery of letters." Mr. Conti seeks fees for his paralegals to attend courtroom technology training (and to travel to the courthouse). The court has reviewed all of the paralegal time entries, and finds that approximately 40% of them describe time spent on non-legal work or on work that the court cannot determine is legal. The award Mr. Conti seeks for the work of the four paralegals is $172,000, which comes to $103,000 after the 40% reduction.

Mr. Conti's three attorneys claim $780,000 in compensable work, to which the court adds the $103,000 of compensable paralegal work. The court now considers the reasonableness of the resulting $883,000 figure.

## C.     Counsel Has Not Accounted For Mr. Conti's Limited Success.

Mr. Conti's legal team spent substantial time pursuing claims on which he did not succeed. Counsel expended more than 80 hours on an unsuccessful effort to convince the court to allow Mr. Conti to add CSG's alleged corporate successor as a party to the case. Counsel invested far too much time in efforts to hold Mr. Anderson and Ms. Gardner personally liable, only to voluntarily dismiss Mr. Conti's claims against Mr. Anderson on the eve of trial and against Ms. Gardner after unnecessarily dragging her through trial.

ORDER – 41

Counsel unreasonably insisted that Ms. Gardner was liable for retaliating against him even though there was no evidence that she was involved in the only employment decisions that could possibly have been retaliatory.  The court dismissed the retaliation claims against Ms. Gardner well before trial began.

Mr. Conti narrowly survived (for the most part) summary judgment on his claims of age discrimination and retaliation, but those claims had no realistic probability of success.  His age discrimination case was built on nothing more than the fact that he was older than most of his co-workers.  There was no evidence at trial that suggested that Mr. Conti's age had anything to do with any decision that Defendants made about him.  Mr. Conti voluntarily dismissed his federal age discrimination claim before the jury could reject it.  The court could have granted Defendants' motion for judgment as a matter of law on his WLAD age-discrimination claim, but preferred to allow the jury to dispose of it.  The jury did so.  His retaliation claim was built on the proposition that CSG took actions against him not because of his race or national origin, but because he allegedly threatened to file an EEOC complaint after he learned that his pay would be cut.  It is unlikely the jury believed even that Mr. Conti had mentioned the EEOC, much less that CSG took any action because he mentioned the EEOC.

The list of unsuccessful work goes on.  Counsel unsuccessfully pursued punitive damage claims that never reached the jury.  Counsel unsuccessfully asked the court to grant summary judgment in Mr. Conti's favor as to liability on his race and national origin discrimination claims.  Counsel's motions in limine were almost entirely unsuccessful.  Counsel spent precious minutes of his trial time moving for judgment as a matter of law *at the conclusion of his own case*.

The court's task is to make a reasonable estimate of how much time counsel expended in the pursuit of successful claims.  That task is difficult here.  In many instances, there was substantial overlap between the claims on which Mr. Conti ultimately succeeded and counsel's unsuccessful pursuits.  Nonetheless, the court is

ORDER – 42

convinced that Mr. Conti's legal team would have spent much less time if they had not

invested so much time in unsuccessful arguments.  The court concludes, after a review of

all of the time entries, that a reduction of all remaining time by 30% is a reasonable

reflection of Mr. Conti's limited success.  That leaves $618,000 (70% of $883,000).

**D.      Counsel Pursued This Litigation Inefficiently.**

The court must award only reasonable attorney fees, and in this case the court is

convinced that much of the time counsel spent pursuing successful claims was not

reasonably expended.  Two considerations underlie that conclusion.

First, after presiding over the trial and substantial pretrial proceedings, the court is

convinced that Mr. Conti's counsel litigated this case in a sprawling, unfocused,

inefficient manner that greatly increased the amount of time his attorneys and paralegals

spent on his case without any reasonable expectation that the work would improve Mr.

Conti's prospects.  The time entries reflect many instances in which multiple attorneys

performed the same work.  They also reflect that counsel devoted excessive time to many

tasks, even ignoring duplicative work.

Second, counsel's billing records show that counsel made virtually no effort to

rein in attorney time during the final year of this litigation.  The court's rough

calculations show that counsel spent more than 350 hours in the two-month period from

mid-February 2013 to mid-April 2013 preparing summary judgment briefing and

responding to Defendants' two dispositive motions.  After the court continued the trial at

the parties' request, counsel began trial preparation in earnest in mid-October.  From

mid-October to the beginning of trial, counsel spent more than 1000 hours.  That included

more than 60 hours spent on a "focus group" whose benefit to Mr. Conti is not clear.

Counsel expended 1000 hours preparing for trial even though discovery had closed and

there was no motion practice other than the parties' motions in limine.  From the first day

of trial to the day the jury returned its verdict (11 days later) counsel spent more than 550

hours.  On each of the days during trial, at least six timekeepers recorded time.  The court

ORDER – 43

is convinced that it would have made no difference at trial if half as many timekeepers had been present.  The court is convinced that counsel could have spent substantially less time in each of these critical phases if lead counsel had made reasonable efforts to reduce duplicative work, to keep staffing at reasonable levels, and to focus on work that was likely to benefit Mr. Conti.

The court's mention of work unlikely to benefit Mr. Conti deserves additional discussion.  This litigation too often devolved into barely relevant (or entirely irrelevant) contests between Mr. Conti's lead counsel and Defendants' lead counsel.  The court observed as much when it ruled on the parties' 34-part motions in limine:

> Throughout discovery, dispositive motions, and now these pretrial motions, the parties have demonstrated an extraordinary willingness to raise disputes about virtually everything, from the substantial to the trivial, that might possibly be at issue in this case. If the parties were actually to raise at trial every factual dispute they raised in their dispositive motions and other pretrial motions as well as these motions in limine, trial would take months.

Nov. 20, 2013 ord. (Dkt. # 129) at 2.  At trial, not only did the parties not stop their practice of fighting for the sake of fighting, it became worse and more personal.  The parties' lead counsel were on too many occasions unable to treat each other civilly.  That practice has occurred again in the motions before the court.  Mr. Conti's reply on his motion for attorney fees, for example, consists of two lengthy declarations from lead counsel and associate counsel responding to what they perceived as personal attacks from Defendants' lead counsel.  This irrelevant or barely relevant argument was the subject of two declarations totaling nearly 30 pages.  The parties filed dozens of pages of briefing on Mr. Conti's request to supplement his attorney fee motion with evidence of Defendants' local counsel's attorney fees in a recent employment case.  That is marginally relevant, but certainly not worth the time the parties spent disputing it.  The evidence ultimately made no difference to the court.  While fighting vigorously over this marginalia, Mr. Conti's counsel meanwhile failed to offer more than the most meager evidence to support his request for costs, made no meaningful attempt to acknowledge

ORDER – 44

unsuccessful claims, failed to cite legal authority for many important propositions, and otherwise gave short shrift to disputes that might have benefitted Mr. Conti. The court mentions these squabbles not because it wishes to honor them by devoting discussion to them, but because they highlight counsel's willingness to expend substantial resources on disputes that had no real possibility of benefitting Mr. Conti. That was too often counsel's approach in this litigation.

Considering all of these factors (and considering that the court has already attempted to remove unsuccessful work), the court reduces all remaining time by an additional 30%. The court chooses that figure after a review of all time entries in an effort to determine the proportion of them that were dedicated to disputes that were of no benefit to Mr. Conti. This final 30% reduction yields a final sum of $433,000 (70% of $618,000), which is Mr. Conti's lodestar figure.

The lodestar figure squares reasonably with Mr. Conti's results at trial. He recovered damages of about $190,000. Courts can consider the ratio of damages to attorney fees to assess the reasonableness of the fees. *E.g.*, *Scott Fetzer Co. v. Weeks*, 859 P.2d 1210, 1216 (Wash. 1993) ("While the amount in dispute does not create an absolute limit on fees, that figure's relationship to the fees requested or awarded is a vital consideration when assessing their reasonableness."); *Mahler*, 957 P.2d at 650-51 ("[T]he amount of the recovery, while a relevant consideration in determining the reasonableness of the fee award, is not a conclusive factor. . . . We will not overturn a large attorney fee award in civil litigation merely because the amount at stake in the case is small."). In this case, the court believes that the $970,000 that Mr. Conti requested would be plainly excessive in light not only of his recovery at trial, but because it is unlikely that he would have recovered more at trial even if he had been completely successful. The emotional damages he received were on the high end of what he could reasonably have expected given the evidence at trial. And, as noted, he had no realistic prospect of winning punitive damages.

ORDER – 45

Considering all of these factors, the court concludes that the lodestar amount of $433,000 is reasonable.

**E.   The Court Will Not Apply a Lodestar Multiplier.**

The court will not apply a multiplier to the lodestar amount.  A multiplier applies in exceptional circumstances that the lodestar calculation does not adequately reflect. Here, Mr. Conti's counsel points to the exceptional risk it incurred in pursuing Mr. Conti's claims through trial, when it faced the prospect that it would not recover at all. But counsel was apparently somewhat immune to risk; as the court noted, it pursued claims and legal theories that had little or no chance of success, and invested inordinate effort in suing Mr. Anderson and Ms. Gardner only to voluntarily dismiss all claims against them.  Focusing Mr. Conti's core claims of race and national origin discrimination, the court does not find this to be an exceptionally risky case.  It also does not find counsel's performance to be exceptional.

**F.   Mr. Conti's Evidence Supports No More than a Modest Cost Award.**

There is no dispute that Mr. Conti is entitled to an award of reasonable costs.  Mr. Conti, however, provided virtually no evidence to support his request for $35,000 in costs.  His counsel neither adequately documented the costs nor demonstrated that the costs were incurred in the service of Mr. Conti's successful claims.  The court will award only limited costs.

The court will not award several categories of costs.  The court will not compensate counsel for its choice to videotape several depositions.  The court will not award "messenger fees" without any evidence that the use of a messenger was necessary. The court will not award "process service fees" when there is no evidence that Mr. Conti incurred those fees in serving process on Defendants against whom he prevailed.  The court will not award costs for "copying" or "document imaging" without evidence that the copying or imaging was necessary at trial.  The court will not compensate counsel for any "working lunch" or "working dinner," nor will it compensate counsel for taxi fares.

ORDER – 46

The court will not award fees for legal research services without evidence that counsel actually incurred those fees, and actually incurred them in successful work. The court will not award costs for deposition transcripts that were not used at trial or in a successful motion or opposition to a motion. The court will not award "investigation costs" when there is no evidence of their purpose. The court will award costs for unspecified long-distance phone calls. The court will not award costs for a focus group. The court will not award costs for unspecified "transcriptions." The court will not award the costs of a voluntary mediation, especially where there is no evidence as to how the parties shared those costs.

Defendants have acceded to a cost award of $15,000. In the court's view, even that is likely excessive given Mr. Conti's meager evidence of his costs. Nonetheless, the court will award $15,000 as a reasonable estimate of Mr. Conti's appropriately-requested costs, including his filing fee, fees for depositions he reasonably used at trial, and a reasonable allowance for copying.

**G.      The Court Awards Pre- and Post-Judgment Interest.**

Defendants did not object to Mr. Conti's request for prejudgment interest as to the jury's economic damages award, and post-judgment interest on all other amounts. The court accordingly imposes interest at an annual rate of 5.25%, commencing on January 1, 2011, as to the jury's $20,160 economic damages award. The court chooses that date because it corresponds with the end of the six post-employment months for which the jury appears to have awarded Mr. Conti economic damages. Interest on the jury's remaining damages award ($170,625.12) will accrue at the same annual rate commencing on December 17, 2013, the day the court entered judgment. The court will enter an amended judgment today reflecting the attorney fees and costs, and interest on that portion of the award will accrue at the same annual rate beginning today.

**H.** **Mr. Leon is Responsible for the Amended Judgment in Proportion to the Jury's Assessment of His Liability.**

Mr. Conti hopes to hold Mr. Leon and CSG jointly and severally liable for all of his attorney fees and costs. The only authority he cites for that proposition, however, is the same authority he relied on in his unsuccessful attempt to impose joint and several liability for the jury's entire damage award. Absent any authority from the parties, the court will apportion attorney fees just as the jury apportioned Mr. Conti's damages.

The damages the jury awarded against Mr. Leon are entirely noneconomic, so he bears no liability for prejudgment interest. As to interest accruing after the court's December judgment, today's attorney fee and cost award, and all other interest, the judgment will reflect that Mr. Leon is jointly and severally liable with CSG in the same ratio as the jury's assessment of his responsibility for damages. For reasons the court has already explained, he is jointly and severally liable for $10,000 of the jury's $190,785.12 award, or 5.2% of that award. He is jointly and severally liable for the same percentage of the court's attorney fee and cost award, or $22,500 (5.2% of $448,000).

## VIII.   CONCLUSION

For the reasons previously stated, the court orders as follows:

1) The court DENIES Defendants' renewed motion for judgment as a matter of law and their motion for a new trial. Dkt. ## 219, 221.

2) The court DENIES Mr. Conti's motion for relief from the court's December 17, 2013 judgment on the jury's verdict. Dkt. # 234.

3) The court GRANTS Mr. Conti's motion for attorney fees, costs, and prejudgment interest, but awards substantially less than Mr. Conti requested. Dkt. # 193. The court awards $433,000 in attorney fees and $15,000 in costs.

4) The court GRANTS Mr. Conti's motion to supplement the record supporting his attorney fee motion, but does so solely because the court's consideration of the additional evidence Mr. Conti submitted causes no prejudice to Defendants. Dkt. # 248.

ORDER – 48

The clerk shall enter an amended judgment reflecting this order and the court's attorney fee award.

DATED this 10th day of July, 2014.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 49